UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORETON BINN and MARISOL F, LLC,
Derivatively on Behalf of Nominal Defendant,
XPRESSPA GROUP, INC. f/k/a FORM
HOLDINGS CORP.,

                 Plaintiffs,

          v.

BRUCE T. BERNSTEIN, RICHARD K. ABBE,
ANDREW R. HEYER, SALVATORE
GIARDINA, ANDREW D. PERLMAN, BRIAN
DALY, ROCKMORE INVESTMENT MASTER
FUND, L.P., and B3D, LLC,

                 Defendants,

          and

XPRESSPA GROUP, INC. f/k/a FORM
HOLDINGS CORP.,

Nominal Defendant,

Civil Action No. 1:19-cv-6122

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

      Plaintiffs Moreton Binn and Marisol F, LLC (together with Mr. Binn, the "Plaintiffs"), by

their undersigned attorneys, bring this shareholder derivative action on behalf of nominal

defendant XpresSpa Group, Inc. f/k/a Form Holdings Corp. ("XpresSpa" or the "Company")

alleging wrongdoing against certain current and/or now former members of the Company's Board

of Directors and Company Officers, including Bruce T. Bernstein, Richard K. Abbe, Andrew

Perlman, and Salvatore Giardina, Andrew R. Heyer (altogether, the "Interested Directors"), and

certain related individuals and entities including Brian Daly ("Daly"), Rockmore Investment

Master Fund, L.P. ("Rockmore"), and B3D, LLC ("B3D" and together with Daly and Rockmore,

the "Rockmore Defendants").

TABLE OF CONTENTS

I.    NATURE OF THE ACTION ....................................................................................4

II.   JURISDICTION AND VENUE ..............................................................................8

III.  PARTIES ................................................................................................................8

    A.   Plaintiffs ..........................................................................................................8

    B.   Individual Defendants ......................................................................................9

    C.   The Company ..................................................................................................10

IV.   FACTUAL BACKGROUND ................................................................................11

    A.   Airport Terminal Concession Leases Are Scarce and Valuable Assets ........11

    B.   Changes to Rules Governing Accounting For Long-Term
         Leases Were Announced in February 2016......................................................11

    C.   The Company's 2016 Acquisition of the XpresSpa
         and the Valuable Lease Portfolio ..................................................................13

    D.   The Interested Directors.................................................................................14

    E.   Following the Merger, the Interested Directors Deceptively
         Characterized the Value of the Lease Portfolio as Goodwill ........................17

    F.   The Interested Directors' Actions Artificially Depressed the
         Stock Price and Market Capitalization of the Company ................................18

         i.    The 2017 Equity Offering .......................................................................19

         ii.   The Convertible Notes .............................................................................20

         iii.  The Fraudulent Goodwill Impairment .....................................................21

         iv.   Efforts to Expropriate the Value Of the Lease Portfolio
               by Engineering a Default of the Rockmore Note ....................................21

         v.    Amendments to the Convertible Notes; Insider Trading;
               Efforts to Convert the Rockmore Note ....................................................23

    G.   The Business Judgment Rule Does not Apply to the
         Actions of the Interested Directors.................................................................25

V.    DUTIES OF THE INTERESTED DIRECTORS....................................................28

A.     Fiduciary Duties.................................................................................................28

B.     Control Access and Supervision ........................................................................29

C.     Reasonable and Prudent Supervision.................................................................30

VI.   DEMAND FUTILITY...................................................................................................31

VII.  SECURITIES VIOLATIONS BY BERNSTEIN, ABBE, AND DALY .............................33

VIII. COUNT I  (Breach of Fiduciary Duty against the Interested Directors)...............................34

IX.   COUNT II  (Corporate Waste against the Interested Directors) ...........................................35

X.    COUNT III  (Unjust Enrichment against the Interested Directors and Daly).....................36

XI.   COUNT IV  (Faithless Servant Doctrine against the Interested Directors) .........................36

XII.  COUNT V  (Aiding and Abetting against Daly)...................................................................37

XIII. COUNT VI  (Aiding and Abetting against Giardina and Bernstein) ...................................38

XIV.      COUNT VII  (Violation of § 10(b) of the Exchange Act and
          Rule 10b-5 Promulgated Thereunder against the Interested Directors) ...........................39

XV.   COUNT VIII  (Violation of § 20 of the Exchange Act against
          Bernstein, Abbe, and Daly) ..............................................................................................41

XVI.      PRAYER FOR RELIEF .............................................................................................42

XVII.  JURY DEMAND.......................................................................................................43

## I.   <u>NATURE OF THE ACTION</u>

Plaintiffs make these allegations upon personal knowledge as to their own actions and, as to all other matters, on information and belief based upon the investigation of their undersigned counsel which includes, among other things: (1) a review and analysis of the Company's public filings with the Securities and Exchange Commission (the "SEC"); (2) a review of press releases, news articles, and other public statements and reports issued by or concerning the Company; and (3) a review of court records and regulatory proceedings, including but not limited to, pleadings and other documents filed in various actions involving the Company and the Defendants.

1.      This is a shareholder derivative action brought by Plaintiffs on behalf of nominal defendant XpresSpa against certain members of the Company's Board of Directors (*i.e.*, the Interested Directors, as defined herein) and certain individuals and entities acting in concert with the Interested Directors (*i.e.*, the Rockmore Defendants, as defined hereinß).

2.      The Company owns and operates the XpresSpa® brand of spas located at approximately 56 retail concession venues in airport terminals throughout North America. Through a wholly-owned subsidiary, the Company holds long-term leases to the overwhelming majority of these concession venues. This portfolio of leases (the "Lease Portfolio") represents one of the largest portfolios of airport retail concession venues. Airport retail concession leases are valuable assets because the consumers who shop at such venues are a "captive" market, *i.e.*, their shopping is restricted to retail venues located within the security zones of airport terminals. Retail businesses operating out of such venues have more pricing power over such consumers and, therefore, lessees holding long-term leases to retail concession venues in airport terminals can generate materially more revenue form such venues that ordinary retail locations. Throughout the

Relevant Period (as defined below), the market value of the Lease Portfolio has been at least $19 million and as much as $39 million.

3.    Plaintiffs allege that during the period of December 23, 2016 through the present (the "Relevant Period") the Interested Directors violated their fiduciary duties and exposed the Company to substantial harm by entering into self-interested transactions specifically designed to cause the stock price and market capitalization of the Company to fall as much as possible below the value of the Lease Portfolio.

4.    The Interested Directors either directly or indirectly own, control, or have an interest in a senior secured credit facility held by Rockmore (the "Rockmore Note"), which is secured by the Lease Portfolio, or otherwise purchased the Company's stock with knowledge that its price was artificially depressed. By artificially driving down the market capitalization of the Company below the principal balance of the Rockmore Note, while at the same time deceptively reporting and otherwise omitting from the Company's public files information concerning the true value of the Lease Portfolio, the Interested Directors and the Rockmore Defendants could then foreclose on the Lease Portfolio, convert the Rockmore Note into stock at artificially depressed prices, or simply purchase stock for themselves at artificially depressed prices.

5.    To achieve this purpose, the Interested Directors manipulated a change in accounting rules announced in February 2016 to deceptively underreport the true value of the Company's primary asset, the Lease Portfolio, and otherwise engaged in wasteful and abusive financing activities so as to drive the share price and share price and market capitalization of the Company below the principal of the Rockmore Note, thereby positioning themselves to either foreclose on the Lease Portfolio or convert the Rockmore Note debt into common stock at an artificially depressed stock price.

6.     The Interested Directors' self-interested actions achieved their intended effect. Between January 4, 2017 and June 28, 2019, the stock price crashed over 95% from $42.79[1] to $1.94 per share. Market capitalization fell from $40 million to approximately $3.8 million. During this time the market value of the Lease Portfolio remained approximately $19 million to $39 million but the Interested Defendants omitted this fact from the Company's filings with the SEC. Yet the principal balance of the Rockmore Note was never paid down and remained at $6.5 million, now far more than the market capitalization of the Company.

7.     By way of the wasteful and self-interested financing activities orchestrated by the Interested Directors, the Company realized over $13 million in cash proceeds. The Interested Directors stated to investors that these proceeds would purportedly be used to grow the Company's Lease Portfolio and revenue generated therefrom. However, there has been no material growth in the Lease Portfolio, the Company's cash on hand fell from $17 million to $3 million during the Relevant Period, and none of the cash proceeds were used to pay down the Rockmore Note, the balance of which has remained at $6.5 million during the entire period. It appears that most of these proceeds were used to pay unwarranted compensation and benefits. The net effect of these financing activities was to contribute to the drastic fall in the stock price.

8.     By April 1, 2019, the market capitalization of the Company had fallen to $3.6 million, well below the principal balance of the Rockmore Note of $6.5 million. The Interested Directors, aided and abetted by the Rockmore Defendants, then attempted to begin the process of expropriating the valuable Lease Portfolio for themselves by engineering a default under of the Rockmore Default, which they controlled.

---

[1] Adjusted for a 1-for-20 reverse split effective February 22, 2019.

9.     On April 24, 2019, Plaintiffs applied to the Hon. Louis L. Stanton, District Court Judge, S.D.N.Y. for a temporary restraining order enjoining Bernstein from permitting or suffering Rockmore from declaring a default. The Company, dominated and controlled by the Interested Directors, appeared by counsel to *oppose* Plaintiffs' application for the temporary restraining order that would avoid a possible foreclosure of the Lease Portfolio. On April 29, 2019, the Hon. Louis L. Stanton entered a temporary restraining order enjoined Bernstein from causing, permitting, or suffering Rockmore or its successors from declaring a default.

10.     At or around the same time the temporary restraining order was entered, Bernstein, Abbe, and Daly conspired to purportedly transfer control over the Rockmore Note to B3D and Daly. These actions constitute a bad faith attempt to circumvent the Court's temporary restraining order.

11.     On June 27, 2019, the Company reported for the first time that it was in discussions with B3D to convert $3,000,000 of the principal balance of the Rockmore Note into common shares and warrants for the issuance of common shares. At current stock prices, such a conversion would transfer to B3D (and, therefore, Bernstein, Abbe, and Daly) up to 44% of the Company's common stock – the value of which is comprised primarily of the Lease Portfolio. In other words, conversion of the Rockmore Note into common stock at these prices constitutes a foreclosure by other means.

12.     By way of their self-interested transactions, the Interested Directors breached their fiduciary duties to the Company and caused massive damage to the value of shareholders' stock.

13.     The Interested Directors also disseminated or approved false or misleading statements about the Company's assets designed to artificially depress the price of the Company's stock. The Interested Defendants engaged in a scheme to defraud the Company by causing it to

sell securities at artificially depressed prices, to effectively consent to a default of the Rockmore Note, and otherwise seek to convert the Rockmore Note debt into common stock and other securities at artificially depressed prices, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 and Section 20(a) of the Exchange Act.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims asserted in this action. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there exists complete diversity between Plaintiffs and the Defendants and the amount in controversy exceeds $75,000.

16.     This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District, is a corporation conducting business and operating in this District or has, as set forth herein, engaged in tortious conduct that occurred in this District.

17.     Venue is proper in this district in accordance with 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III.     PARTIES

### A. Plaintiffs

18.     Plaintiff Moreton Binn is an individual residing in Fairfield County, Connecticut. Mr. Binn has been a shareholder of the Company throughout the Relevant Period.

19.     Plaintiff Marisol F, LLC is a limited liability company organized and existing under the laws of the State of New York.  Marisol Binn is the sole member of Marisol F, LLC.  Marisol Binn is a resident of Fairfield County, Connecticut.  Marisol F, LLC has been a shareholder of the Company throughout the Relevant Period.

**B.  Individual Defendants**

20.     Defendant Bruce T. Bernstein is an individual and has been a director of the Company since February 8, 2016. Bernstein has been a member of the Compensation, Audit, and Nominating and Corporate Governance Committees of the Board of Directors of Company since February 8, 2016. Since February 2018, Bernstein has served as Chairman of the Board of Directors.

21.     From at least 2015 through April 30, 2019, Bernstein controlled the Rockmore Note directly through Rockmore and/or indirectly through B3D.  Bernstein and Daly purportedly assigned to B3D the rights under the Rockmore Note for no or insufficient consideration. On April 30, 2019, Bernstein purported to transfer to Daly a majority membership interest in B3D for no or insufficient consideration.

22.     Defendant Richard K. Abbe served as a director of the Company from March 9, 2016 to December 18, 2018.  Abbe owns and/or controls Iroquois Master Fund Ltd., an investment vehicle through which he acts on behalf of the Interested Directors. Abbe also owns or controls American Capital Management LLC. Through American Capital Management, LLC, Abbe holds an interest in the Rockmore Note.

23.     Defendant Salvatore Giardina is an individual and served as a director of the Company from May 23, 2016 through the present. Giardina is a member and the chairperson of the Audit Committee of the Board of Directors since May 23, 2016. Giardina is a member of the Interested Directors.

24.     Defendant Andrew D. Perlman is an individual and served as a director of the Company from September 2009 until he resigned on April 19, 2018. He also previously served as Chief Executive Officer of the Company from approximately 2012 until April 2018.

25.     Defendant Andrew R. Heyer is an individual residing in Westchester County, New York.  Heyer has been a director of the Company since December 23, 2016.  Heyer is the founder and CEO of Mistral, through which he owns, controls, and has purchased a substantial number of shares of Company's common stock and other securities.

26.     Defendant Donald E. Stout is an individual and served as a director of the Company from July 19, 2012 through the present.  Stout served as a member of the Compensation, Audit, and Nominating and Corporate Governance Committees of the Board of Directors of the Company during the relevant period.

27.     Defendant Brian Daly is an individual and a member of B3D. Along with the Interested Directors, Daly is a member of the Co-Investment Group and has derived personal benefits from serving the needs of the Co-Investment Group and their activities in public companies.

28.     On March 22, 2019, the Court unsealed records evidencing that Abbe and Daly have held from its inception a financial participation interest of at least $1,620,000 in the Rockmore Note. Abbe's and Daly's financial participation in the Rockmore Note was concealed until after Plaintiffs commenced litigation in connection with the merger.

**C.  The Company**

29.     Defendant XpresSpa f/k/a Form Holdings Corp. is a corporation organized and existing under the laws of the State of Delaware. The principal offices of the Company are located at 780 Third Avenue, 12th Floor, New York, NY 10017.

30.     Throughout the relevant period, the Company has been listed on The NASDAQ Capital Markets, LLC ("NASDAQ").

## IV.     FACTUAL BACKGROUND

### A.  Airport Terminal Concession Leases Are Scarce and Valuable Assets

31.     Nearly all airport terminals lease to private businesses retail concession venues. Most of these venues are located between security checkpoints and boarding gates. Mid- to long-term leases to airport concession venues represent highly valuable assets for two primary reasons. First, travelers are restricted from moving outside the secure zone of airport terminals and, therefore, represent a "captured market" of retail consumers. Second, there are a limited number of airport concession venues available to serve this captured market of retail consumers. Therefore, retail businesses serving this captured market have more pricing power than businesses serving the general retail market and ownership of a mid- to long-term lease to an airport concession venue necessarily brings with it a future revenue stream that reflects this greater pricing power.

32.     Most airport retail concession spaces are leased for terms of between seven to ten years. Generally, the limited supply of airport concession venues throughout North America are held by only a handful of companies who have assembled portfolios of long-term leases for the most valuable concession locations in major airport terminals.

33.     Because of the scarcity of these types of leases, and the captive nature of the market served at those locations, portfolios of airport concession leases represent assets of substantial value to the companies that own them.

### B.  Changes to Rules Governing Accounting For Long-Term Leases Were Announced in February 2016

34.     The Financial Accounting Standards Board® ("FASB") Accounting Standards Codification® is the authoritative source of generally accepted accounting principles ("GAAP")

applicable to public companies. Previously, generally accepted accounting principles ("GAAP") applicable to public companies did not require long-term operating leases to be recognized as a "right-to-use" asset and corresponding liability on the balance sheet and, therefore, valuable long-term lease transactions could be operated as "off balance sheet" transactions unless otherwise disclosed by management.

35.    Updates to the Accounting Standards Codification® are disseminated by FASB through Accounting Standards Updates ("ASUs" or an "ASU"). In February 2016, the FASB issued ASU No. 2016-2 "Leases (Topic 842)" (the "Lease ASU"). The Leases ASU advised public companies that for fiscal years beginning after December 15, 2018 a "right-of-use asset" and corresponding lease liability must be recognized on their books, thereby forcing public companies to bring long-term lease transactions onto the balance sheet.

36.    According to the Lease ASU, "[t]he economic benefits from use of an asset [i.e., the right-of-use asset to be recognized] include its primary output and by-products (including potential cash flows derived from these items) and other economic benefits from using the asset that could be realized from a commercial transaction with a third party. . . ."

37.    By way of the Lease ASU, beginning the fiscal year following December 15, 2018, public companies owning portfolios of airport concession leases would be required to recognize on their books the value expected to be derived from the "right-to-use" that accompanies their lease portfolios and a corresponding liability reflecting the costs of the those leases. These two numbers may not necessarily be the same, for example, when the value of the "potential cash flows derived" from lease portfolios exceeds the expected liability the "right-to-use" asset recognized on the balance sheet would exceed the liability.

38.     The Lease ASU further provides that public companies could early adopt the new standards set forth in the Lease ASU. In July 2018, the FASB issued ASU No. 2018-11 "Leases (Topic 842) – Targeted Improvements" (the "Transition ASU"). The Transition ASU provided for alternative means by which public companies could transition from prior GAAP accounting for long-term leases to the new standards required in the Lease ASU.

**C.  The Company's 2016 Acquisition of the XpresSpa**
   **and the Valuable Lease Portfolio**

39.     Effective December 28, 2016, the Company completed the acquisition of XpresSpa Holdings, LLC ("Old XpresSpa"), the owner and operator of the XpresSpa® brand of spas located in airport terminal around the nation and abroad. Among other things, the Company acquired by way of the merger a portfolio of approximately 53 long-term operating leases to concession venues in airport terminals around the nation (the "Lease Portfolio") and the intellectual property and goodwill associated with the XpresSpa® brand.

40.     In connection with the merger, the Company assumed the obligations under the Rockmore Note and recognized the principal balance of that obligation, $6.5 million, on its books as a long term liability. The Company disclosed that Rockmore was controlled by Bernstein. The Company failed to disclose that Abbe held a financial participation interest in the Rockmore Note.

41.     In connection with the merger, the shareholders of the Company were solicited to vote the following individuals to the Board of Directors, effective immediately upon closing: Bernstein, Abbe, Perlman, Heyer, Stout and Engelman. Shareholders of the Company agreed to the foregoing slate of directors and, effective December 23, 2016, the foregoing directors assumed their roles on the Board of Directors.

**D.  The Interested Directors**

42.    Under Delaware law, actions of a Board of Directors are not entitled to the protections of the business judgment rule when the challenged actions were not approved by a majority of the Board of Directors consisting of disinterested directors. During the Relevant Period, three or more of Bernstein, Abbe, Perlman, and Giardina (the "Interested Directors") formed a majority of the Board of Directors but at all times failed to meet the standard of disinterestedness required to qualify for application of the business judgment rule.

43.    First, each of the Interested Directors have relied on and personally benefited from a longstanding co-investment relationships with each other and Daly (altogether, the "Co-Investment Group"). Each of the Interested Directors has individually received personal wealth and lucrative investment opportunities by way of their longstanding relationship and affiliation as members of the Co-Investment Group. Because of the history of benefits received as a result of their relationship and affiliation with the Co-Investment Group, each of the Interested Directors has a strong and powerful incentive to place the interests of the Co-Investment Group before the interests of the companies on whose boards they serve.

44.    The extent and nature of the interest each of the Interested Directors has in advancing the objectives of the Co-Investment Group are evidence by their historical activities concerning other public companies. Ordinarily, the Interested Directors first take a position in a target company by way of the acquisition of a substantial ownership of the target company's stock or by causing one of their investment vehicles to enter into a convertible debt facility or other debt financing on coercive terms.

45.    Following the initial investment, the Interested Directors will then use their initial foothold position to cause members of the Interested Directors to be appointed to the Board of Directors of the target company.  Once one member of the Interested Directors is appointed to a

board, other members of the Interested Directors are quickly appointed to directorships until the group attains the power to control the affairs of the target company.

46.     Members of the Interested Directors are then appointed to the Audit and Compensation Committees of the target company.  Once the Interested Directors have effected a change of control, they grant themselves valuable compensation and otherwise use the target company to refinance the initial investment on favorable terms.

47.     The Interested Directors, acting through various investment vehicles, have implemented schemes to effect changes of control or other coordinated activities with respect to National Holdings Corporation ("NHC"),[2] Neurotrope, Inc. ("Neurotrope"), GeoResources, Inc., USA Technologies, Inc., and TapImmune, Inc.

48.     To effect these schemes, the Interested Directors have used various investment vehicles, such as Rockmore, controlled by Bernstein, and Iroquois[3] and American Capital

---

[2]     For example, in 2014, Salvatore Giardina held a foothold directorship in NHC.  Abbe and a business partner from Iroquois sent a notice of intent to nominate a slate of three directors to stand for election at the upcoming annual meeting to the board of directors.  Following this notice, NHC agreed to an investor settlement agreement that, inter alia, caused Abbe to be appointed to the board of directors and the board to nominate Abbe's Iroquois business partner as a director. Upon the declination of one current director to stand for re-election and the resignation of another board member immediately following the annual meeting, the board of NHC formed a strategy committee to be comprised of six non-management members, including either Abbe or his Iroquois business partner, *inter alia*. Giardina, by way of his undisclosed arrangement with Abbe, remained on the board after the investor settlement agreement. Abbe and his business partner, as well as Giardina, then voted as directed by Abbe and another Iroquois partner, for the purpose of exercising control over the affairs of NHC. Immediately following the Annual Meeting in July 2014, the newly-formed Strategy Committee included Abbe, his Iroquois business partner, and Giardina.  In or about September 2016, Abbe and Giardina caused NHC to complete a tender offer by a subsidiary of Fortress Biotech, Inc., receiving a premium in exchange for their initial investment while diluting the existing shareholders of NHC.

[3]     Bernstein, and Abbe used similar means to effect a change of control of a public company named Neurotrope, Inc. ("Neurotrope"). Neurotrope is a startup biotechnology company that licenses its core technology from another entity. First, Abbe caused Iroquois to take a 9.99% beneficial interest in Neurotrope.  Then, in connection with a public offering disclosed in July 2016, Abbe caused Iroquois to commence litigation against Neurotrope.  Abbe agreed to settle the litigation in exchange for an increase in the size of the board of directors and the appointment of a fellow Iroquois partner to the board of directors of Neurotrope.  Shortly thereafter, the board was increased again and, on November 14, 2016, Bruce Bernstein was appointed as a director of that company. Pursuant to the undisclosed arrangement between Abbe and Bernstein, Bernstein was appointed as the Chairman of the Audit Committee and also a member of the Compensation Committee, Nominating ,and Corporate Governance Committees of the board. In short order, Perlman was also elected as a director and appointed to the Audit and Compensation Committees.  Bernstein, Perlman, and Abbe's fellow Iroquois partner all voted to award to themselves, and continue to receive, valuable shares

Management, LLC, both investment vehicles controlled by Abbe, to coordinate their control over target companies.

49.     Over the years, each member of the Interested Directors has gained personal benefit, including cash and equity compensation, from their respective membership and participation in the activities of the Co-Investor Group. Accordingly, each member of the Co-Investor Group has a substantial financial interest in remaining a member of and aiding and abetting future activities of the Co-Investor Group.[4]

50.     For each of the Interested Directors, the importance of a maintaining a continued relationship with the Co-Investor Group outweighs the interests of the target company for which the Interested Director serves as a director. For example, in prior proceedings in this action, Abbe's financial interest in the Rockmore Note was publicly revealed by way of the unsealing of a document produced by Bernstein's ex-wife. Following the public disclosure of this document in 2018, the Co-Investor Group excluded Bernstein from participating in their activities concerning Dropcar, Inc., a public company listed on NASDAQ, by removing Bernstein from the board of directors of that company. Bernstein then commenced a civil action against his ex-wife seeking damages for lost profits.

51.     Bernstein, Abbe, and Daly have direct interests in the transactions challenged in this action relating to the Rockmore note. Abbe and Daly hold substantial personal financial interest because they directly participated in the Rockmore note. Bernstein controlled the Rockmore Note through is control of Rockmore and later B3D. Bernstein was also interested in

---

of Neurotrope stock.
[4]     *See* Doc. No. 1, Complaint, *Bruce T. Bernstein v. Sheryl Aufrichtig*, Index No. 65212-2019 (Sup. Ct. New York Cty)

the Rockmore Note through his longstanding relationship with Daly from which Bernstein has generated and received personal benefit.

### E. Following the Merger, the Interested Directors Deceptively Characterized the Value of the Lease Portfolio as Goodwill

52.     At the close of the merger, the Lease Portfolio acquired by the Company represented one of the largest portfolio of airport concession leases in North America with a fair value of between $19 to $39 million. Old XpresSpa, however, had not yet transitioned to compliance with the Lease ASU. In other words, Old XpresSpa did not recognize on its books a separate right-to-use asset reflecting the value of the Lease Portfolio. Thus, fair value of the Lease Portfolio was not reflected on the balance sheet of Old XpresSpa at the time of the merger. In other words, the Lease Portfolio was effective an "off balance sheet" asset.

53.     The Interested Directors were aware of and knew of the true value of the Lease Portfolio and, indeed, converting that asset for themselves was their objective. The Interested Directors were also aware of the Lease ASU and, therefore, they knew that beginning in 2019 the Company would be required to recognize on its balance sheet a separate asset reflecting the Lease Portfolio.

54.     Pursuant to the Lease ASU, the Company was obligated to transition from the prior GAAP standards for accounting for long-term leases to the new standards reflected in the Lease ASU and that in order to do so, the Company was entitled to "early adopt" the standards of the Lease ASU that would require recognition of the Lease Portfolio on the balance sheet. The close of the merger was an ideal time to recognize on the books a right-to-use asset reflecting some of the value of the Lease Portfolio.

55.     Notwithstanding this knowledge, the Interested Directors elected to not separately recognize on its balance sheet the value of the Lease Portfolio as a separate asset. Instead, the

Interested Directors caused the Company to report $37.5 million consideration for the merger, of which $18 million was recognized as goodwill. By doing so, the Interested Directors knowingly elected to characterize as goodwill what otherwise would have constituted a "right-of-use" asset reflecting a portion of the value of the Lease Portfolio acquired by way of the merger. In light of the Lease Portfolio's market value of approximately $18 to $40 million, substantially all of the goodwill recognized in connection with the merger comprised the value of the Lease Portfolio that otherwise would have been recognized as a "right-to-use" asset.[5]

56.     The Interested Directors decision to characterize a portion of the value of the Lease Portfolio as goodwill was deceptive because the Lease Portfolio comprised to majority of the assets acquired by the Company and the Interested Directors failed to disclose that within two years, the Company would be required to recognize the value of the Lease Portfolio as a separate asset on its balance sheet.

57.     The Interested Directors recognition of goodwill as described above was also misleading and deceptive because Bernstein, Abbe, and Heyer all had prior knowledge of the business and value of Old XpreSpa and its Lease Portfolio. They knew or should have known that the Lease Portfolio was worth anywhere between $19 million to $39 million. The omission of this information from the Company's reports filed with the SEC and disseminated to the market, while recognizing $18 million of goodwill was deceptive and misleading.

**F. The Interested Directors' Actions Artificially Depressed the Stock Price and Market Capitalization of the Company**

58.     After the merger, the Controlling Group used their control and power over the

---

[5]     In a Form S-4/A filed by the Company on October 25, 2016, the Company reported a "Spa leasehold improvements, property and equipment, net" asset of $14,085,000. This asset did not reflect the "right-of-use" value of the revenue stream reasonably expected to be received from the Lease Portfolio. Instead, this asset reflected the depreciated value of leasehold improvements and attachments made by Old XpresSpa before the merger.

Company to cause the Company to take certain actions designed to drive down the share price and market capitalization of the Company.

59.     Knowing that by way of their interests in the Rockmore Note they had full control over and a security interest over the Lease Portfolio, the Interested Directors knew that driving down the stock price and market capitalization to an amount below the principal balance of the Rockmore Note would result in a opportunity to obtain for themselves the majority of the value of the Lease Portfolio by manufacturing a default under the Rockmore Note.

### i.   The 2017 Equity Offering

60.     On July 26, 2017, the Company entered into an underwriting agreement with Roth Capital Partners, LLC to underwrite the issuance and sale of 6,900,000 shares of common stock at a 7% discount (the "2017 Equity Offering").

61.     The sale of the 2017 Equity Offering realized cash proceeds of approximately $6,584,000. The purported purpose of acquiring new long-term leases for airport concession venues. Yet the Company failed to realize any value from the proceeds generated from the sale of the 2017 Equity Offering. The Company failed to acquire any material number of new long-term lease locations, it reported no new assets, no material improvement in results, and its cash on hand actually fell during the period during which the notes were sold.

62.     Notably, the Interested Directors used none of those proceeds to pay down any portion of the principal balance of the Rockmore Note.

63.     The net effect of the 2017 Equity Offering was to further dilute the existing shareholders no corresponding increase in assets or revenue, thereby causing the stock price to fall.

### ii.    The Convertible Notes

64.    On May 15, 2018, the Interested Directors caused the Company to enter into a securities purchase agreement for the sale to certain investors of up to an aggregate principal of $4,428,000 of 5% secured convertible notes due on November 16, 2019 (the "Convertible Notes"). The Convertible Notes provide for conversion of all or any portion of the principal balance of the notes into (i) shares of common stock at the price of $12.40 per share; (ii) Class A Warrants to purchase common shares at an exercise price of $12.40 per share; and (iii) Class B Warrants to purchase common shares at an exercise price of $12.40 per share. At the time of the execution of the securities purchase agreement for the Convertible Notes, the price of the Company's common stock closed at $12.00 per share.

65.    The sale of the Convertible Notes realized proceeds of $4,350,000 for the purported purpose of acquiring new long-term leases for airport concession venues. Yet the Company failed to realize any value from the proceeds generated from the sale of the Convertible Notes. The Company failed to acquire any material number of new long-term lease locations, it reported no new assets, no material improvement in results, and its cash on hand actually fell during the period during which the notes were sold.

66.    Notably, the Interested Directors used none of those proceeds to pay down any portion of the principal balance of the Rockmore Note.

67.    The net effect of the convertible notes was to further increase the debt on the books of the Company with no corresponding increase in assets or revenue, thereby causing the stock price to fall.

### iii.     The Fraudulent Goodwill Impairment

68.     On May 15, 2018, the Company reported a goodwill impairment of $19.6 million (the "Goodwill Impairment"), comprising substantially all of the goodwill of the company resulting from the acquisition of the Lease Portfolio.

69.     This goodwill impairment was false and misleading because substantially all of the goodwill should have been recharacterized as a separate "right-to-use" asset representing the value of the Lease Portfolio and the Company had not disposed of the Lease Portfolio. Thus, there was no legitimate basis to writedown all of the goodwill.

70.     The Interested Directors should have recharacterized substantially all of the goodwill recognized on the Company's books from the merger into a new "right-to-use" asset on the balance sheet. But the Interested Directors knew that they were not required to comply with the Lease ASU, by recognize the value of the Lease Portfolio as a separate asset, until 2019. Thus, declining to do so in the interim, and characterizing the majority of value acquired by way of the merger as goodwill that could be fully impaired in the meantime, presented to the Interested Directors an opportunity to commit fraud by artificially depressing the stock price.

71.     Although the Interested Directors knew the true market value of the Lease Portoflio, $19 million to $39 million, they omitted any reference to the value of this asset while writing off entirely the Company's goodwill in filings with the SEC.

72.     Predictably, the goodwill impairment resulted in a massive decline in the stock price and an increase in short interest in the Company's stock.

### iv.     Efforts to Expropriate the Value Of the Lease Portfolio by Engineering a Default of the Rockmore Note

73.     On April 1, 2019, the Company filed its Form 10-K for the fiscal year ending December 31, 2018. The 10-K revealed the Interested Directors' first steps to exploit for their own

gain the efforts they had undertaken the drive down the stock price and market capitalization of the Company.

74.     In the 10-K the Interested Directors reported for the first time that the Company's auditors had issued a going concern notice. The basis for the going concern was the issuance of a "going concern" notice by the Company's auditors.

75.     The Rockmore Note provides for certain covenants requiring the Company to provide, on an annual basis, audited financials without any qualifications as to whether there exist doubts as to the status of the Company as a "going concern," *i.e.,* whether it can satisfy its obligations on an ongoing basis.

76.     The specific terms of the Rockmore Note, however, give rise to the motive and opportunity for self-dealing by Bernstein, aided and abetted by Abbe and Daly. More specifically, the original term of the Rockmore Note was two years initially ending on December 31, 2017. In connection with the merger, Rockmore agreed to extend the term for an additional year. However, a one-year extension effectively precludes the Company from complying with the "going concern" covenant because in order to do so, the Company would need to demonstrate to its auditors that it could pay off the Rockmore Note in full before the end of the extended term.

77.     As described above, the Interested Directors had caused the Company's cash on hand to drop from approximately $17 million as of the close of the merger to far less than $6.5 million and, therefore, the Company was not able to demonstrate that it could pay off the Rockmore Note in full and the Company's auditors would necessarily need to issue a going concern advisory.

78.     In any year when Rockmore declined to extend the term of the Rockmore Note, Legacy XpresSpa's auditors would be forced to issue a going concern qualification in the financials reported to Rockmore because the full principal of the note would become due within

less than one year from the date of the audited financials and, therefore, the obligations under the note would become a current liability affecting Legacy XpresSpa as a going concern. If, on the other hand, Rockmore elected to extend the term, then the obligations under the note would remain a long-term liability that would not require the auditors to issue a going concern qualification.

79.     Thus, by choosing whether or not to extend the term, Bernstein, aided and abetted by Abbe and Daly could engineer a default of the note. If Bernstein, Abbe, and Daly elected to engineer a default, they could then proceed to execute on the security interest in the Lease Portfolio, thereby effecting a transfer of corporate assets to Bernstein, Abbe, and Daly, through their interests in Rockmore and B3D.

80.     The Company has never defaulted on its payment obligations to Rockmore. The default threatened in the 2018 Form 10-K[6] was engineered by Bernstein while he also served in the capacity as Chairman of the Board of Directors

81.     Upon an application by Plaintiffs, this the Hon. Louis L. Stanton, U.S. District Court Jugde, S.D.N.Y., temporarily restrained Bernstein from permitting or suffering the declaration of default under the Rockmore Note.

### v.    Amendments to the Convertible Notes; Insider Trading; Efforts to Convert the Rockmore Note

82.     On May 15, 2019, the Company issued its financial results for the first quarter 2019, recognizing for the first time a "right-to-use" asset on its balance sheet. However, it recognized an asset valued at only $9.6 million. This value underestimates the true value of the "right-to-use" derived from the Lease Portfolio.

---

[6] In the 10-K, the Interested Directors also reported for the first time that they intended to begin recognizing a "right-to-use" asset on the Company's balance sheet. However, they reported to expect the value of this asset to be only in the $10 to $12 million range, far lower than a reasonable estimate of the value of the "right-to-use" asset.

83.     By May 15, 2019, substantially all of the principal and interest of the Convertible Notes had already been convert into common stock. However, the remaining balance owed under the Convertible Notes had priority over the security interest of the Rockmore Note. Thus, the Interested Directors, including Bernstein, along with Abbe and Daly, had a motive to induce the holders of the Convertible Notes to convert their debt to common stock and make the Rockmore Note security interest the most senior.

84.     As of early June 2019, however, the conversion price of the Convertible Notes was higher than the market price of the stock. Accordingly, the Interested Directors engaged in a scheme to induce the holders of the Convertible Notes to convert their remaining balances into common stock.

85.     On June 25, 2019, the price of the Company's stock closed at $1.82. Between June 25, 2019 and open of the market on the morning June 26, 2019, the volume of short interest in the Company's stock rose from 1,180 to 2,877,376, exceeding the total number of shares issued and outstanding.

86.     The magnitude of short interest created a short squeeze causing the price of the stock to skyrocket on June 26, 2019 to as high as 158% from the prior close. That day, the stock closed at $4.71, representing a gain of 129% from the last close. No news concerning the Company had been reported.

87.     On June 27, 2019, at 9:00 a.m., the Company issued a Form 8-K disclosing that effective that morning it had entered into agreements with holders of the Convertible Notes to convert all of the remaining balances of those notes by no later than 4:00 p.m. June 28, 2019.

88.     The agreement provided for a reduced conversion price of $2.48 per share. Thus, this conversion would be profitable for the holders of the Convertible Notes only if the price of

the stock rose above $2.48 per share. Before the Company's filing of the Form 8-K on June 27, 2019, the existence of negotiations between the Company and the holders of the Convertible Notes, and the new conversion price, constituted material non-public information.

89.     One or more of the Interested Directors disclosed this non-public material information before the open of the market on June 26, 2019. As reported by user "TitoMojito" on the XpresSpa forum on the trading website stocktwits.com:

> $XSPA we fuckin did it boys. Huge shout out to @gstockz who let me know about this short play real-time yesterday [June 26, 2019]. It was a nice play to begin with leading into pre-market, but that early morning 8-K was the icing on the cake. . . .

90.     In the same Form 8-K, the Interested Directors disclosed for the first time that the Company was negotiating with Daly and B3D to convert up to $3,000,000 of principal and interest of the Rockmore Note into common stock and warrants. Both the negotiation of an early conversion of the Convertible Notes and disclosure of material non-public information that would incentives the holders of those notes to agree to convert presented a motive and opportunity for the Interested Directors to release material non-public information before issuance of the Form 8-K on the morning of June 27, 2019.

91.     On June 28, 2019, the stock closed at $1.94.

**G. The Business Judgment Rule Does not Apply to the Actions of the Interested Directors**

92.     The 2017 Equity Offering, the Convertible Notes, Goodwill Impairment, and the Interested Directors' other activities in June 2019 were all self-interested transactions because when the Interested Directors voted or otherwise approved these transactions, they had a vested interest in driving down the stock price and market capitalization of the Company as much as possible.

93.     When the Board of Directors approved each of these transactions, Bernstein, Abbe, Perlman, and/or Giardina together formed a majority but failed to meet the standards of disinterestedness required for application of the business judgment rule. Bernstein and Abbe failed to meet the requisite standards of disinterestedness because they had direct and/or indirect interest in driving down the value of the stock and market capitalization of the Company while failing to apply any of the proceeds of the proceeds of these transactions towards payment of the principal on the Rockmore Note. Perlman and Giardina failed to meet the requisite standards of disinterestedness because of their fealty to Bernstein and Abbe and their interest in acquiring stock at artificially depressed prices.

94.     While each of these transactions contributed to and resulted in the drastic fall in the stock price, the 2017 Equity Offering and the Convertible Notes generated over 10,350,000 in cash proceeds for the Company. The Company used none of those proceeds to pay down any portion of the Rockmore Note. Instead, from the close of the merger through the present the principal balance of the Rockmore Note remained $6,500,000.

95.     Once the market capitalization fell below the principal balance of the Rockmore Note, the Bernstein, Abbe, and Daly could then either foreclose on the Lease Portfolio, by way of Rockmore's security interest, or convert some or all of the principal balance of the Rockmore Note into majority of the Company's common stock. At the same time, the Interested Directors would be able to acquire substantial amounts of the common stock, or warrants for common stock, at artificially deflated prices.

96.     Afterwards, the Interested Directors would be in a position to cause the Company to recognize on its books the full value of the Lease Portfolio and, thereby, drive the price of the stock back up.

97.     Between January 4, 2017 and June 25, 2019, the stock price fell from $42.79 to $1.82 per share. Market capitalization fell from $40 million to approximately $3.7 million.

98.     The following chart shows the toxic effect of Interested Directors' scheme to drive the company into insolvency:

| Date | Cash Realized by Fin'g Activities: | Cash on Hand | Leases | Stock Price[7] | Shares Issued and Outstanding | Market Cap[8] | Rockmore Note Prin. Balance |
|---|---|---|---|---|---|---|---|
| December 30, 2016 | $0.00 | $17,910,000 | 53 | $42.60 | 18,304,881 | $38,989,396 | $6,500,000 |
| March 31, 2017 | $0.00 | $11,673,000 | 53 | $43.40 | 19,198,454 | $41,660,645 | $6,500,000 |
| June 30, 2017 | $0.00 | $7,958,000 | 52 | $33.00 | 19,565,531 | $41,660,645 | $6,500,000 |
| September 31, 2017 | $6,130,000 | $10,072,000 | 51 | $27.80 | 26,540,690 | $36,898,509 | $6,500,000 |
| December 31, 2017 | $0.00 | $6,368,000 | 56 | $27.40 | 26,545,690 | $35,040,310 | $6,500,000 |
| March 31, 2018 | $0.00 | $3,554,000 | 57 | $14.40 | 26,634,475 | $19,176,822 | $6,500,000 |
| June 30, 2018 | $4,350,000 | $4,458,000 | 57 | $5.80 | 27,114,662 | $7,863,251 | $6,500,000 |
| September 31, 2018 | $0.00 | $2,525,000 | 57 | $3.00 | 31,919,511 | $4,787,926 | $6,500,000 |
| December 31, 2018 | $2,000,000 | $3,403,000 | 56 | $3.20 | 1,761,802[9] | $5,637,766 | $6,500,000 |
| March 31, 2019 | $0.00 | $3,312,000 | 55 | $2.40 | 1,941,341 | $4,659,218 | $6,500,000 |
| June 25, 2019 | $0.00 | $3,312,000 | 55 | $1.89 | 1,941,341[10] | $3,669,134 | $6,500,000 |

99.     During this period, each of the Interested Directors purchase and/or were awarded stock, warrants for the issuance of stock, and/or options at prices that were artificially depressed by way of the Goodwill Impairment and other self-interested actions of the Interested Directors.

100.    Full recognition of value of the Lease Portfolio would result in recognition on the Company's balance sheet of a substantial "right-to-use" asset, an improvement to the Company's balance sheet that will drive up the stock price and the value of the stock and other securities obtained by the Interested Directors are artificially depressed prices.

---

[7]     Adjusted for 20-to-1 reverse split effective February 22, 2019.
[8]     18,304,881 shares issued and outstanding as of December 31, 2016. 26,545,690 shares issued and outstanding as of December 31, 2017. 1,761,802 shares issued and outstanding as of December 31, 2018.
[9]     20-for-1 reverse split.
[10]    Last reported as of March 31, 2019.

### V.     DUTIES OF THE INTERESTED DIRECTORS

#### A.  Fiduciary Duties

101.    The Interested Directors, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. By reasons of their positions as officers and/or directors and fiduciaries and because of their ability to control the business and corporate affairs of the Company, the Interested Directors owe the Company and its stockholders the fiduciary obligations of trust, loyalty, good faith, candor, and due care and were required to do the utmost to control and manage the affairs of the Company in a fair, just, honest, and equitable manner. The Interested Directors were required to act in furtherance of the best interest of the Company and its stockholders so as to benefit all stockholders equally, and not in furtherance of their own personal interests or benefit.

102.    Each officer and director of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Interested Directors had and have a duty of candor; i.e. to promptly disseminate accurate and truthful information regarding the Company's operations, finances, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information and that the Company's shareholders would be appropriately informed thereof.

103.    In failing to fulfill these duties, the Interested Directors repeatedly and continuously, throughout the Relevant Period, made material misstatements of fact regarding the independence of Abbe, the false and misleading impairment of the Company's goodwill, and

commitments that it did not place the self-dealing transactions between the Company and Bernstein, Abbe, and Rockmore above the interests of shareholders.

104.    Specifically, in the Company's filings with the SEC, press releases, investor presentations and other public documents, Defendants misrepresented and omitted material information in breach of their fiduciary duty of disclosure regarding:

      a.    the misleading nature of the goodwill recognized as a result of the merger;

      b.    the Goodwill Impairment; and

      c.    the interest they had in artificially depressing the stock price before full application of the Lease ASU; and

      d.    their individual interests in furthering and continuing their co-investment activities over the interests of the Company.

105.    Material facts have now been disclosed regarding the Company's materially misleading statements during the Relevant Period.

**B. Control Access and Supervision**

106.    The Interested Directors, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various misleading public statements disseminated by the Company.

107.    Because of their advisory, executive, managerial and directorial positions, each of the Interested Directors during the period in which they held their respective positions had access to positive, non-public information about the value of the Company's portfolio of airport concession leases and had a duty to refrain from misrepresenting the value of that portfolio while holding an interest or controlling the Rockmore Note that was secured by that portfolio while in possession of such undisclosed materially positive information.

108.    At all times relevant hereto, each of the Interested Directors was the agent of each of the other Interested Directors and of the Company, and was at all times acting within the course and scope of such agency.

### C. Reasonable and Prudent Supervision

109.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company. By virtue of such duties, the Interested Directors were required to, among other things:

a.  ensure that the Company complied with applicable legal obligations, requirements and regulations, including an appropriate transition to compliance with the Lease ASU, with adequate disclosures, so as to disseminate truthful and accurate statements to the investing public;

b.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with applicable laws, rules and regulations;

d.  properly and accurately guide investors and analysts as to the true financial condition of the Company, including making accurate statements and disclosures about the Company's operations and financial results;

110.    The Interested Directors breached their fiduciary duty of loyalty and good faith by knowingly, recklessly, and negligently engaging in toxic financing transactions resulting in the precipitous decline in the Company's market capitalization, wasting and mismanaging the proceeds of those toxic financing transactions, failing to pay down any portion of the principal of

the Rockmore Note, declining to early adopt the Lease ASU, improperly failing to transition to the Lease ASU in a way that accurately reflected the "right-to-use" value of the Lease Portfolio, and booking a goodwill impairment of $19 million as of March 31, 2018, otherwise mismanaging the Company so as to drive the market capitalization to decline below the principal balance of the Rockmore Note, attempting to declare a default under the Rockmore Note as of May 1, 2019, and entering into discussion to convert $3 million of the balance of the Rockmore Note in to common stock and warrants for the issuance of common stock at artificially deflated prices.

## VI.    DEMAND FUTILITY

111.    A director's personal financial interest attributable to business interests over which an interested person has substantial influence gives rise to an inference under Delaware law that such a director cannot act independently from the interested person. *See*, *e.g.*, *Marchand v. Barnhill*, No. 533, 2018, 2019 WL 2509617, at *11 (Del. June 18, 2019) ("[Delaware] law has recognized that deep and longstanding friendships are meaningful to human beings and that any realistic consideration of the question of independence must give weight to these important relationships and their natural effect on the ability of the parties to act impartially toward each other"); *Delaware Cty. Employees Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015).

112.    Demand to the Board of Directors to commence an action against the Interested Directors concerning the matters alleged herein would be futile because of the long-standing financial relationships between the Interested Directors.

113.    Demand futility is further proven here by the longstanding relationship between Bernstein and Daly in connection with their control and participation in the Rockmore Note. In 2017 Rockmore, controlled at all times by Bernstein, purported to assign the Rockmore Note to B3D for no or insufficient consideration. At that time, Bernstein and Daly were equal members of

B3D with Bernstein authorized to act as the "Controlling Director" of B3D. On April 29, 2019, Bernstein purported to transfer to Daly his interest in B3D for no or insufficient consideration.

114.    On June 27, 2019, the Company reported that it was in discussions to convert up to $3 million of the balance of the Rockmore Note into common stock which is currently trading at the artificially depressed price of $1.82 per share. Imputing the estimated value of the Lease Portfolio to the number of shares common stock issued and outstanding, the true value of the stock should be somewhere between $10 to $40 per share.

115.    By these transactions Bernstein and Daly are beholden to each other. Bernstein now has an expectation of receiving compensation from Daly in exchange for the transfer of Bernstein's interest in B3D to Daly. Daly has an expectation that Bernstein and the other Interested Directors will ultimately cause the Company to convert the Rockmore Note into common stock at depressed prices and then drive up the stock. Therefore, none of Bernstein's actions concerning the Rockmore Note qualify as disinterested. Daly's actions constitute aiding and abetting a breach of fiduciary duty.

116.    The actions of the Company in connection with prior proceedings in this action further establish demand futility. On April 24, 2019, Plaintiffs made an application for a temporary restraining order to enjoin Bernstein or anyone acting in concert with him from declaring a default under the Rockmore Note. Because a default under the Rockmore Note could lead to a possible foreclosure of the Company's Lease Portfolio, the Company necessarily has a strong interest in avoiding a default under the Rockmore Note.

117.    Notwithstanding the Company's substantial interest in avoiding a default under the Rockmore Note, the Company appeared by counsel to oppose Plaintiff's application for a temporary restraining order to enjoin the declaration of a default. The Company opposed the

application because it is utterly dominated by the Interested Directors. Accordingly, demand on the Board of Directors would be futile.

## VII. SECURITIES VIOLATIONS BY BERNSTEIN, ABBE, AND DALY

118. In his capacity as a members of the Audit Committee, and Chairman of the Board of Directors, Bernstein falsely misstated the goodwill of the Company and/or disseminating and/or authorizing false statements writing down the goodwill as zero while failing to recharacterize any portion of the goodwill as a "right-to-use" asset on the Company's balance sheet. In his capacity as one member of the Interested Diretors, Abbe approved or otherwise authorized these misstatements.

119. These misstatements are material as they resulted in an $18 million charge effective as of March 31, 2018 when the Company's market capitalization was $19 million. This charge, without an otherwise mitigating disclosure as to the true market value of the Lease Portfolio, resulted and otherwise contributed to the drastic fall in the value of the Company's stock price.

120. The Company relied on the Interested Directors to truthfully and accurately report its financial condition and otherwise monitor and approve the accurate reporting of its financial condition in reports filed with the SEC and released to investors so that the Company's stock price would be maximized for the benefit of all shareholders.

121. Bernstein, Abbe, and the other Interested Directors acted with scienter because they had both the motive to commit fraud and the opportunity to do so. The acquisition of a highly valuable Lease Portfolio a few years before the Lease ASU standards became mandatory presented an opportunity to deceptively report goodwill, "right-to-use" assets, and other accounting conventions, such as prior GAAP standards that permitted public companies to treat valuable leases as "off-balance sheet" assets, in a deceptive and misleading manner that artificially depressed the share price of the Company. The Interested Defendants were motivated to use

accounting misstatements, deceptive reporting, and selective omissions of material facts, to artificially depress the share price because they directly or indirectly controlled the Rockmore Note and Rockmore's security interest over the Lease Portfolio. Driving down the market capitalization of the Company to an amount below the principal balance of the Rockmore Note would position the Interested Directors to expropriate the majority of the value of the Lease Portfolio for themselves, either by foreclosure or conversion of the Rockmore Debt into a majority of the common stock of the Company at artificially depressed prices.

122.    The Interested Defendants' statements caused loss to the Company by driving down its share price by more than 95%. During this Relevant Period, the Company issued common stock, convertible notes, warrants for the issuance of common stock, preferred stock, and other securities to Calm, Inc., the Interested Defendants, and others at artificially depressed prices. Had the Interested Defendants truthfully and accurately reported the goodwill or otherwise early adopted the standards of the Lease ASU, the Company would have realized substantially more proceeds from its financing activities during the Relevant Period.

## VIII.    COUNT I

### (Breach of Fiduciary Duty against the Interested Directors)

123.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

124.    As directors of Company, the Interested Directors owed to the Company the fiduciary duties of loyalty, good faith, candor, and due care.

125.    In connection with the conduct alleged herein, the Interested Directors breached their fiduciary duties of loyalty, good faith, candor, and due care by, *inter alia*, (i) falsely, deceptively, and misleadingly characterizing a substantial portion of the value of the Lease Portfolio as goodwill or otherwise failing to recognize or disclose the value of the Lease Portfolio;

(ii) entering into unnecessary or wasteful financing transactions with the motive and opportunity to artificially depress the price of the Company's stock and market capitalization; (iii) wasting and/or otherwise failing to adequately supervise the application of proceeds from interested financing activities; (iv) falsely, deceptively, and/or misleadingly writing down all of the Company's goodwill associated with the acquisition of the Lease Portfolio; (v) deceptively engineering a default under the Rockmore Note; (v) entering into and selectively disclosing agreements to early convert the debt evidences by the Convertible Notes; and (vi) seeking to convert $3 million of the indebtedness evidenced under the Rockmore Note into common stock and other securities at artificially depressed prices.

126.    The foregoing breaches of fiduciary duty proximately caused damage to the Company.

## IX.    COUNT II

### (Corporate Waste against the Interested Directors)

127.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

128.    Defendants breached their fiduciary duties by failing to properly supervise and monitor the Company by allowing the Company to engage in an illegal, unethical and improper course of conduct.

129.    As a result of the Interested Directors' illicit course of conduct and breaches of fiduciary duty, the Company has wasted valuable corporate assets through payments of compensation to the Interested Directors because the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the Interested Directors' unlawful course of conduct complained of herein.

130.     Additionally, the wrongful conduct alleged herein includes the Interested Directors' failure to implement adequate internal controls to detect and prevent the misleading statements regarding the Company's goodwill and bad faith transition to the Lease ASU. Under the Interested Directors' direction, the Company has already incurred a 95% decrease in share price.

131.     As a result of the misconduct alleged herein, the Interested Directors are liable to the Company.

132.     By reason of the foregoing, the Company was damaged.

## X.     COUNT III

### (Unjust Enrichment against the Interested Directors and Daly)

133.     Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

134.     By way of the foregoing, one or more of the Interested Directors and Daly have been enriched by, *inter alia*, the advancement of cash compensation, equity compensation, and other benefits as described above.

135.     The Interested Directors and/or Daly have failed to compensate the Company for the benefits advanced.

136.     It is contrary to equity and good conscience to allow the Interested Directors and/or Daly to retain the benefits advanced by Plaintiff.

137.     By way of the foregoing, the Company is entitled to recovery of all amounts by which the Interested Directors and/or Daly have been unjustly enriched.

## XI.     COUNT IV

### (Faithless Servant Doctrine against the Interested Directors)

138.     Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

139.    Each of the Interested Directors acted in the capacity of agents for the Company and, therefore, each of the Interested Directors owed a duty of loyalty and good faith to the Company.

140.    One or more of the Interested Directors breached their duties of loyalty and good faith by engaging in misconduct directly against the interests of the Company or otherwise engaging in disloyal and faithless conduct that substantially violated their respective relationships with the Company.

141.    By way of the Interested Directors faithless and disloyal conduct, the Company has been damaged.

142.    The Company is entitled to recover from the Interested Directors all compensation and benefits received by them, directly or indirectly, in connection with their relationships with the Company.

### XII.    COUNT V

**(Aiding and Abetting against Daly)**

143.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

144.    By way of the foregoing, the conduct of one or more of the Interested Directors resulted in violations of the fiduciary duties owed to the Company and the violations caused damage to the Company.

145.    Daly provide substantial assistance in achievement of conduct that resulted in one or more violations of the fiduciary duties of the Interested Directors, including but not limited to by purporting to assume or otherwise exercising control over the Rockmore Note as more fully described above.

146.    Daly knew or should have known that his provision of substantial assistance would result in violations of the fiduciary duties of one or more of the Interested Directors, or otherwise had the motive and opportunity to provide substantial assistance towards the violation of the fiduciary duties of one or more of the Interested Directors.

147.    By way of the foregoing, the Company has been damaged.

### XIII.    <u>COUNT VI</u>

**(Aiding and Abetting against Giardina and Bernstein)**

148.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

149.    By way of the foregoing, the conduct of one or more of the Interested Directors resulted in violations of the fiduciary duties owed to the Company and the violations caused damage to the Company.

150.    Giardina and Bernstein provide substantial assistance in achievement of conduct that resulted in one or more violations of the fiduciary duties of the Interested Directors, including but not limited to by substantially assisting, in their capacities as members of the Audit Committee, in the misleading and improper accounting of the Company's goodwill and leases as more fully described above.

151.    Giardina and Bernstein knew or should have known that their provision of substantial assistance would result in violations of the fiduciary duties of one or more of the Interested Directors, or otherwise had the motive and opportunity to provide substantial assistance towards the violation of the fiduciary duties of one or more of the Interested Directors.

152.    By way of the foregoing, the Company has been damaged.

### XIV.   COUNT VII

**(Violation of § 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder against the Interested Directors)**

153.   Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

154.   During the Relevant Period, the Interested Directors have carried out a plan, scheme, and course of conduct, which was intended to, and did: (i) deceive the Company, investors, the market, and existing shareholders, as alleged herein; and (ii) cause the Company to enter into purchases and sales of its securities at artificially deflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Interested Directors took the actions set forth herein, including but not limited to making, disseminating, and circulating inaccurate and misleading statements concerning the value of the Lease Portfolio, goodwill, and other assets acquired in the merger, writing down the Company's goodwill in a misleading and deceptive manner, omitted to disclose material facts concerning the Lease Portfolio, and concealing Abbe's financial participation in the Rockmore Note.

155.   As specifically detailed herein, the Interested Directors, in violation of §10(b) of the Exchange Act and Rule 10b-5: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and purchasers of the Company's stock in an effort to benefit the Interested Directors at the expense of shareholders and the Company.

156.   The Interested Directors, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal material information about the value of

its assets, including the Lease Portfolio, and the interests they had in artificially depressing the price of the Company's stock.

157.    The Interested Directors employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to acquire Company securities at artificially depressed prices or to provide to Rockmore, B3D, Abbe, Bernstein, and/or Daly to acquire stock and other securities at artificially depressed prices.  These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the foregoing not misleading.  As set forth more particularly herein, the Interested Directors further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the Company, Plaintiffs, and other investors. The Interested Directors had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. The Interested Directors' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the foregoing from the investing public.  The Interested Directors, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

158.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the Interested Directors awarded to themselves and their acolytes compensation and other amounts at the expense of the

Company and its shareholders, the results of which caused damage to the Company and other investors.

159.    At the time of said misrepresentations and/or omissions, the Company reasonably believed them to be true.

160.    Had the Company known the truth regarding the foregoing, which was not disclosed, the Company would not have purchased or otherwise sold stock or other securities or would not have done so at the artificially depressed prices.

161.    By virtue of the foregoing, the Interested Directors have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

162.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases of the Company's stock.

## XV.    <u>COUNT VIII</u>

### (Violation of § 20 of the Exchange Act against Bernstein, Abbe, and Daly)

163.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

164.    Within the meaning of §20(a) of the Exchange Act, as alleged herein Bernstein, Abbe, and Daly acted as controlling persons as to the Company and the other members of the Interested Directors. By virtue of their positions as directors (in the case of Bernstein and Abbe) and their control and financial interests in contractual rights, including the senior secured Rockmore Note, and their respective stock ownership, their participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Bernstein, Abbe, and Daly had the power to influence and control, and did influence and control, directly or indirectly, the

decision making of the Company, including the content and dissemination of the various statements which Plaintiffs allege to be false and misleading.

165.    Bernstein and Abbe were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

166.    In particular, Bernstein, as Chairman of the Board of Directors, had direct and supervisory responsibility for the operations and accounting of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Daly had the power to influence the affairs and conduct of Bernstein by way of his substantial financial participation in the Rockmore Note and Bernstein's economic incentive to maintain his beneficial relationship with Daly.

167.    As set forth above, one or more of Bernstein, Abbe, Perlman, Giardina, and/or the Company violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Verified Shareholder Derivative Complaint.

168.    As a direct and proximate result of Bernstein, Abbe, and Daly's wrongful conduct, the Company suffered damages. By virtue of their positions as controlling persons, Bernstein, Abbe, and Daly directed, controlled, or otherwise influenced the acts and/or omission as alleged herein and, therefore, are liable pursuant to § 20(a) of the Exchange Act.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, and in favor of the Company as follows:

**(a)**    Awarding to the Company damages in an amount to be determined at trial;

**(b)**      Awarding to the consequential damages;

**(c)**      Awarding to the Company disgorgement;

**(d)**      Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the stock compensations awards described herein;

**(e)**      Equitable subordination of all secured debt currently owned or controlled by Bernstein, Abbe, Daly, Rockmore, and/or B3D.

**(f)**      Awarding to the Company pre-judgment interest, post-judgment interest, and attorney's fees;

**(g)**      Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiffs' attorneys, experts, and accountants; and

**(h)**      Granting Plaintiffs such other and further relief as this Court deems just and proper.

## XVII.      <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated: New York, New York        CKR Law LLP
       June 30, 2019

By:   <u>*/s/ Michael James Maloney*</u>
       Rosanne E. Felicello
       Michael James Maloney
1330 Avenue of the Americas
14th Floor
New York, New York 10019
Tel. (212) 259-7300
rfelicello@ckrlaw.com
mmaloney@ckrlaw.com

*Attorneys for Plaintiffs Moreton Binn and Marisol F, LLC*

## <u>VERIFICATION</u>

I, Moreton Binn, being duly sworn, declare as follows:

I am the named plaintiff in this action. I have been the holder of common stock and/or Series D Preferred Stock of XpresSpa Group, Inc. f/k/a Form Holdings Corp. (the "Company") continuously during the relevant period defined in the foregoing Verified Shareholder Derivative Complaint (the "Complaint"). I am ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based on discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 30, 2019

_____
Moreton Binn

## <u>VERIFICATION</u>

I, Marisol Binn, being duly sworn, declare as follows:

I am the sole member of the named plaintiff, Marisol F, LLC, in this action. I have authority to make this verification on behalf of Marisol F, LLC. Marisol F, LLC has been the holder of common stock and/or Series D Preferred Stock of XpresSpa Group, Inc. f/k/a Form Holdings Corp. (the "Company") continuously during the relevant period defined in the foregoing Verified Shareholder Derivative Complaint (the "Complaint"). Marisol F, LLC is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based on discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 30, 2019                    MARISOL F, LLC

                                        By: _____
                                             Marisol Binn