UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MORETON BINN and MARISOL F, LLC,
Derivatively on Behalf of Nominal Defendant,
XPRESSPA GROUP, INC. f/k/a FORM
HOLDINGS CORP.,

                Plaintiffs,

        v.

BRUCE T. BERNSTEIN, RICHARD K. ABBE,
ANDREW R. HEYER, SALVATORE
GIARDINA, BRIAN DALY, ROCKMORE
INVESTMENT MASTER FUND, L.P., and B3D,
LLC,

                Defendants,

       and

XPRESSPA GROUP, INC. f/k/a FORM
HOLDINGS CORP.,

Nominal Defendant,

Civil Action No. 1:19-cv-06122(GHW)

**FIRST AMENDED VERIFIED
SHAREHOLDER DERIVATIVE
COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiffs Moreton Binn and Marisol F, LLC (together with Mr. Binn, the "Plaintiffs"), by

their undersigned attorneys, bring this shareholder derivative action on behalf of nominal

defendant XpresSpa Group, Inc. f/k/a Form Holdings Corp. ("XpresSpa" or the "Company")

alleging wrongdoing against certain current and/or now former members of the Company's Board

of Directors, including Bruce T. Bernstein ("Bernstein"), Richard K. Abbe ("Abbe"), and

Salvatore Giardina ("Giardina"), Andrew R. Heyer ("Heyer"), and certain related individuals and

entities including Brian Daly ("Daly"), Rockmore Investment Master Fund, L.P. ("Rockmore"),

and B3D, LLC ("B3D") (together with Daly and Rockmore, the "Rockmore Defendants").

       Plaintiffs make these allegations upon personal knowledge as to their own actions and, as

to all other matters, on information and belief based upon the investigation of their undersigned

counsel which includes, among other things: (1) a review and analysis of the Company's public filings with the SEC; (2) a review of press releases, news articles, and other public statements and reports issued by or concerning the Company; (3) a review of court records and regulatory proceedings, including but not limited to, pleadings and other documents filed in various actions involving the Company and the Defendants; and (4) a review of the affidavit of Professor John Finnerty, attached hereto as Exhibit A. Certain facts at issue here, such as Defendants' state of mind while engaged in the alleged misconduct, and facts not available from sources other than the Defendants, remain particularly within the possession and control of the Defendants, and, therefore, are alleged here on information and belief.

TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................. 5

II.   JURISDICTION AND VENUE ............................................................ 8

III.  PARTIES ............................................................................................. 9

    A.    Plaintiffs ...................................................................................... 9

    B.    Individual Defendants ................................................................. 9

    C.    The Company ............................................................................ 11

IV.  FACTUAL BACKGROUND .............................................................. 12

    A.    Airport Terminal Concession Leases Are Scarce and Valuable Assets ...................... 12

    B.    Changes to Rules Governing Accounting For Long-Term  Leases Were Announced in February 2016 ........................................................... 13

    C.    Installment of the Board of Directors on December 23, 2016 ..................................... 15

    D.    The Interested Directors ........................................................... 15

    E.    The Deceptive Characterization of the Value of the Lease Portfolio as Goodwill ....... 19

    F.    The Interested Directors' Actions Artificially Depressed the  Stock Price and Market Capitalization of the Company ........................................................ 20

        i.    The 2017 Equity Offering ......................................................... 21

      ii.    The Convertible Notes ............................................................... 21

      iii.    The Fraudulent Goodwill Impairment ..................................... 25

      iv.    Efforts to Expropriate the Value of the Lease Portfolio  by Engineering a Default of the Rockmore Note ....................................................... 26

        v.    Amendments to the Convertible Notes; Insider Trading;  Efforts to Convert the Rockmore Note ....................................................... 28

    G.    The Business Judgment Rule Does Not Apply to the  Actions of the Interested Directors ....................................................................... 32

V.    DUTIES OF THE INTERESTED DIRECTORS ............................... 35

    A.    Fiduciary Duties ....................................................................... 35

B.      Control Access and Supervision ................................................................. 37

C.      Reasonable and Prudent Supervision.......................................................... 38

VI.    DEMAND FUTILITY ........................................................................................ 39

VII.   SECURITIES VIOLATIONS BY BERNSTEIN, GIARDINA, ABBE, AND DALY ........ 41

VIII.  COUNT I  Breach of Fiduciary Duty against Bernstein, Heyer, Giardina, and  Abbe (until
       Abbe's resignation from the Board of Directors in December 2018).............................. 42

IX.    COUNT II  Breach of Fiduciary Duty against Bernstein,  Heyer, and Giardina for 2019
       conduct....................................................................................................... 43

X.     COUNT III  Corporate Waste against the Bernstein, Giardina, Heyer, and Abbe .............. 44

XI.    COUNT IV  Unjust Enrichment against Bernstein, Daly, Rockmore and B3D.................. 45

XII.   COUNT V  Faithless Servant Doctrine against Bernstein, Heyer, Giardina, and  Abbe (for
       conduct alleged until his departure from the board in December 2018).......................... 46

XIII.  COUNT VI  Aiding and Abetting against Daly, Rockmore, and B3D................................ 46

XIV.   COUNT VII   Violation of § 10(b) of the Exchange Act and  Rule 10b-5 Promulgated
       Thereunder against  Bernstein, Heyer, Giardina, and Abbe (for conduct  alleged until his
       departure from the board in December 2018).................................................... 47

XV.    COUNT VIII   Violation of § 20 of the Exchange Act against Bernstein, Abbe, and Daly . 50

XVI.   PRAYER FOR RELIEF ...................................................................... 52

XVII.  JURY DEMAND ................................................................................ 52

## I.   <u>NATURE OF THE ACTION</u>

1.      This Action relates to flagrant, self-interested behavior in direct breach of the duties owed to the shareholders of the public company, XpresSpa Group, Inc. f/k/a Form Holdings Corp. ("XpresSpa" or the "Company") and in contravention of federal securities laws.

2.      Since December 23, 2016 through to the present (the "Relevant Period"), the Interested Defendants (including Bernstein, Giardina, Heyer, and Abbe, until his resignation from the board in December 2018) and the Rockmore Defendants have participated in a series of transactions that lack any legitimate business purpose and have resulted in no material benefit for the shareholders of the Company.

3.      These transactions have caused significant harm to all other shareholders of the Company, including Plaintiffs, because the transactions have caused massive dilution of Plaintiffs and similarly situated shareholders, and thereby causing a substantial diminution of the market value of the Company.

4.      Specifically, as will be detailed below, directors Bernstein, Giardina, Heyer, and Abbe (during his tenure as director) were motivated to act in the interest of the holders of a senior secured credit facility (the "Rockmore Note") instead of the interests of the shareholders. The Rockmore Note holds as collateral a senior security interest in all of the Company's assets, including the Company's valuable Wellness business segment, c omprising of an extensive portfolio of long-term leases for its approximately 56 retail concession venues  (the "Lease Portfolio") and the associated intellectual property, goodwill, and other operating assets associated with that business segment (the "Wellness Business").

5.      The Rockmore Note was held by Rockmore and later by defendant B3D. Both Rockmore and B3D are entities controlled by Bernstein (Chairman of the Company's Board) until,

purportedly, on or about April 29, 2019, when Bernstein transferred control of B3D to an entity controlled by Bernstein's longstanding business partner, Daly. Daly and Abbe[1] also held an interest in the Rockmore Note. Because of the senior secured status of the Rockmore Note and its particular features as described in detail in the attached Affidavit of Professor John Finnerty, Ph.D. (attached hereto as Ex. A), the Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director), along with the Rockmore Defendants, were motivated to artificially drive down the Company's market capitalization below the principal balance of the Rockmore Note. By doing do, Bernstein and the Rockmore Defendants stand in position to convert for themselves the Wellness Business, with an estimated value of $26 million to $30 million, without paying fair consideration.

6.      Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director) accomplished this goal by engaging in a series of financial transactions designed to massively dilute existing stockholders, and thereby artificially drive down the stock prices, all without any compelling benefit to stockholders that would justify the cost of dilution.

7.      These schemes included, a dilutive equity offering in 2017, the issuance of highly dilutive convertible notes in 2018, a 2018 misleading write-down of goodwill, along with early adoption of certain accounting rules and delayed adoption of others, and, after Abbe's departure as a director, actions in 2019 including stock price manipulation, amendments to the Rockmore Note and amendments to a stock purchase agreement and the Companies warrants.

8.      Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director) engaged in this self-interested conduct all while knowing that doing so would artificially depress the stock price and market capitalization below what would ordinarily be expected based on the fair value of the Wellness Business.

---

[1] Abbe, through an investment vehicle, held a participation interest in the Rockmore Note at least as of December 23, 2016 through the date of his resignation as a director of the Company in December 2018.

9. These actions caused the Company's stock price to drop precipitously. Between January 4, 2017 and June 25, 2019, the stock price crashed over 95% from $42.79[1] to $1.94 per share. Market capitalization fell from $40 million to approximately $3.8 million. During this time, Bernstein, Giardina, and Heyer knew or should have known that the market value of the Wellness Business remained approximately $26 million to $30 million, but this fact was omitted from the Company's filings with the SEC.

10. Despite realizing over $10 million in cash proceeds from the various, spurious financing activities, and despite causing the Company to state in press releases and public filings that the proceeds of the transactions would be used to grow the Company's Lease Portfolio, inter alia, there has been no material growth in the Lease Portfolio, the Company's cash on hand fell from $17 million to $3 million during the Relevant Period, and none of the cash proceeds were used to pay down the Rockmore Note, the balance of which has remained at $6.5 million during the entire period. It appears that most of these proceeds were used to pay unwarranted compensation and benefits. The net effect of these financing activities was massive dilution to existing stockholders, such as Plaintiffs, which caused ta drastic fall in the stock price. In return, stockholders received no compelling benefit to justify the cost of dilution.

11. The Rockmore Defendants aided and abetted Heyer, Bernstein and Giardina by agreeing to assign the Rockmore Note to B3d for no consideration and then, in 2019, agreeing that Daly would purportedly take control over the Rockmore Note. The Rockmore Defendants then attempted to begin the process of expropriating for themselves the valuable Wellness Busienss, and its Lease Portfolio, by engineering a default under of the Rockmore Default or an effective default by allowing B3D to obtain control of the Company by converting $3 million of the principal

balance of the Rockmore Note into common shares and warrants for the issuance of common shares.

12.     Leading up to the Annual Shareholders' Meeting, scheduled to be held this Monday morning at September 9, 2019, until it was abruptly adjourned at almost 5:00 pm Eastern on Friday, September 6, 2019, the Bernstein, Giardina, and Heyer continued to direct and approve additional financing transactions with no legitimate commercial purpose and intended to enrich themselves and those associated with them, including Abbe, who likely benefited from an amendment to the pricing of warrants made in July, which effectively allows Bernstein to set and change the warrant price at will.

13.     In sum, Bernstein, Giardina, Heyer, and Abbe (during his tenure as director) cannot qualify as disinterested directors because the transactions at issue benefit them, the Rockmore Defendants, and those who invest alongside them, while severely diminishing the value of the Company to all other investors. They clearly do not serve a legitimate business purpose and evidence a breach of fiduciary duty and violations of the federal securities laws.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the common law claims asserted in this action. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there exists complete diversity between Plaintiffs and the Defendants and the amount in controversy exceeds $75,000.

16.     This Court has jurisdiction over each Defendant because each either is an individual with sufficient minimum contacts with this District, is a corporation conducting business and operating in this District or has, as set forth herein, engaged in tortious conduct that occurred in this District.

17.     Venue is proper in this district in accordance with 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### III.     PARTIES

#### A.  Plaintiffs

18.     Plaintiff Moreton Binn is an individual residing in Fairfield County, Connecticut. Mr. Binn has been a shareholder of the Company from December 23, 2016 through the present.

19.     Plaintiff Marisol F, LLC is a limited liability company organized and existing under the laws of the State of New York.  Marisol Binn is the sole member of Marisol F, LLC.  Marisol Binn is a resident of Fairfield County, Connecticut.  Marisol F, LLC has been a shareholder of the Company from December 23, 2016 through the present.

#### B.  Individual Defendants

20.     Defendant Bruce T. Bernstein is an individual and has been a director of the Company since February 8, 2016. Bernstein has been a member of the Compensation, Audit, and Nominating and Corporate Governance Committees of the Board of Directors of Company since February 8, 2016. Since February 2018, Bernstein has served as Chairman of the Board of Directors.

21.     From at least 2015 through April 29, 2019, Bernstein controlled the Rockmore Note directly through Rockmore and/or indirectly through B3D.  In or about 2017, Bernstein and Daly purportedly assigned to B3D certain rights under the Rockmore Note for no or insufficient consideration.  Purportedly on April 29, 2019, Bernstein to transferred to Daly a majority membership interest in, and control of, B3D for no or insufficient consideration. During the Relevant Period, Bernstein, in his capacity as a director, caused the Company to enter into financial transactions that caused the price of XpresSpa securities to be artificially depressed but resulted in no compelling benefit for the Company. During the same period, Bernstein, directly or indirectly through Rockmore and B3D, purchased XpresSpa Securities at artificially depressed prices.

22.     Defendant Richard K. Abbe served as a director of the Company from March 9, 2016 to December 18, 2018.  Abbe owns and/or controls Iroquois Master Fund Ltd., an investment vehicle through which he acts. Abbe also holds a beneficial interest in American Capital Management LLC ("ACM"). During at least a substantial part of the period Abbe served as a director of the Company, he held, through ACM, an interest in the Rockmore Note but failed to disclose that interest in the Company's S.E.C. filings and failed to abstain from matters presented to the Board of Directors that related to the Rockmore Note. During this period, Abbe, in his capacity as a director, caused the Company to enter into financial transactions that caused the price of XpresSpa securities to be artificially depressed but resulted in no compelling benefit for the Company. During the same period he served as a director, Abbe, directly or indirectly through Iroquois or ACM, purchased XpresSpa Securities at artificially depressed prices, including warrants that have now been amended on favorable terms. Upon information and belief, Abbe continues to hold the securities he purchased during the period he was a director.

23.     Defendant Salvatore Giardina is an individual and served as a director of the Company from May 19, 2016 through the present. Giardina has been member and the chairperson of the Audit Committee of the Board of Directors since May 19, 2016.

24.     Defendant Andrew R. Heyer is an individual residing in Westchester County, New York.  Heyer has been a director of the Company since December 23, 2016.  Heyer is the founder and CEO of Mistral, through which he owns, controls, and has purchased a substantial number of shares of the Company's common stock and other securities.

25.     Defendant Brian Daly is an individual and purportedly the controlling member of B3D. Daly has derived personal benefits from serving the needs of Heyer, Bernstein, and Abbe related to XpresSpa.

26.     On March 22, 2019, the Court unsealed records evidencing that Abbe and Daly have held from its inception a financial participation interest of at least $1,620,000 in the Rockmore Note. Abbe's financial participation in the Rockmore Note was concealed until after Plaintiffs commenced litigation in connection with the merger.

**C.  The Company**

27.     Defendant XpresSpa f/k/a Form Holdings Corp. is a corporation organized and existing under the laws of the State of Delaware. The principal offices of the Company are located at 780 Third Avenue, 12th Floor, New York, NY 10017.

28.     Throughout the Relevant Period, the Company has been listed on The NASDAQ Capital Markets, LLC ("NASDAQ").

29.     The Company's primary asset is its "Wellness" business segment (the "Wellness Business"), described in the Company's most recent Form 10-K as follows:

> XpresSpa is a leading airport retailer of spa services and related products. It is a well-recognized and popular airport spa brand with an approximately 50% market share in the United States and nearly three times the number of domestic

locations as its closest competitor. It provides approximately one million services per year. As of December 31, 2018, XpresSpa operated 56 total locations in 23 airports, including one off-airport spa at Westfield World Trade Center in New York City, in three countries including the United States, Netherlands and United Arab Emirates. XpresSpa also sells wellness and travel products through its internet site, www.xpresspa.com. Key services and products offered include:

·   massage services for the neck, back, feet and whole body;

·   nail care, such as pedicures, manicures and polish changes;

·   travel products, such as neck pillows, blankets and massage tools; and

·   new offerings, such as cryotherapy services, NormaTec compression services, and Dermalogica personal care services and retail products.

For over 15 years, increased security requirements have led travelers to spend more time at the airport. In addition, in anticipation of the long and often stressful security lines, travelers allow for more time to get through security and, as a result, often experience increased downtime prior to boarding. Consequently, travelers at large airport hubs have idle time in the terminal after passing through security.

XpresSpa was developed to address the stress and idle time spent at the airport, allowing travelers to spend this time productively, by relaxing and focusing on personal care and wellness. We believe that XpresSpa is well positioned to benefit from consumers' growing interest in health and wellness and increasing demand for spa services and related wellness products.

Form 10-K, filed April 1, 2019.[2]

30.   The Company's Wellness Business includes a portfolio of approximately 56 long-term operating leases to concession venues in airport terminals around the nation (the "Lease Portfolio"), along with associated intellectual property, goodwill and other operating assets.

## IV.   FACTUAL BACKGROUND

### A.  Airport Terminal Concession Leases Are Scarce and Valuable Assets

---

[2] *See* https://www.sec.gov/Archives/edgar/data/1410428/000114420419017496/tv516017_10k.htm, at p.5-6

31.     Nearly all airport terminals lease retail concession venues to private businesses. Most of these venues are located between security checkpoints and boarding gates. Mid- to long-term leases to airport concession venues represent valuable assets for two primary reasons. First, travelers are restricted from moving outside the secure zone of airport terminals and, therefore, represent a "captured market" of retail consumers. Second, there are a limited number of airport concession venues available to serve this captured market of retail consumers. Therefore, retail businesses serving this captured market have greater pricing power than businesses serving the general retail market and ownership of a mid- to long-term lease to an airport concession venue necessarily brings with it a future revenue stream that reflects this greater pricing power.

32.     Most airport retail concession spaces are leased for terms of between seven to ten years. Generally, the limited supply of airport concession venues throughout North America are held by only a handful of companies who have assembled portfolios of long-term leases for the most valuable concession locations in major airport terminals.

33.     Because of the scarcity of these types of leases, and the captive nature of the market served at those locations, portfolios of airport concession leases represent assets of substantial value to the companies that own them.

**B.  Changes to Rules Governing Accounting For Long-Term Leases Were Announced in February 2016**

34.     The Financial Accounting Standards Board® ("FASB") Accounting Standards Codification® is the authoritative source of generally accepted accounting principles ("GAAP") applicable to public companies. Previously, GAAP applicable to public companies did not require long-term operating leases to be recognized as a "right-to-use" asset and corresponding liability on the balance sheet and, therefore, valuable long-term lease transactions could be operated as "off balance sheet" transactions unless otherwise disclosed by management.

35.     Updates to the Accounting Standards Codification® are disseminated by FASB through Accounting Standards Updates ("ASUs" or an "ASU"). In February 2016, the FASB issued ASU No. 2016-2 "Leases (Topic 842)" (the "Lease ASU"). The Leases ASU advised public companies that for fiscal years beginning after December 15, 2018 a "right-of-use asset" and corresponding lease liability must be recognized on their books, thereby forcing public companies to bring long-term lease transactions onto the balance sheet.

36.     According to the Lease ASU, "[t]he economic benefits from use of an asset [i.e., the right-of-use asset to be recognized] include its primary output and by-products (including potential cash flows derived from these items) and other economic benefits from using the asset that could be realized from a commercial transaction with a third party. . . ."

37.     By way of the Lease ASU, beginning the fiscal year following December 15, 2018, public companies owning portfolios of airport concession leases would be required to recognize on their books the value expected to be derived from the "right-to-use" that accompanies their lease portfolios and a corresponding liability reflecting the costs of those leases. These two numbers may not necessarily be the same, for example, when the value of the "potential cash flows derived" from lease portfolios exceeds the expected liability the "right-to-use" asset recognized on the balance sheet would exceed the liability.

38.     The Lease ASU further provides that public companies could early adopt the new standards set forth in the Lease ASU. In July 2018, the FASB issued ASU No. 2018-11 "Leases (Topic 842) – Targeted Improvements" (the "Transition ASU"). The Transition ASU provides for alternative means by which public companies could transition from prior GAAP accounting for long-term leases to the new standards required in the Lease ASU.

**C.  Installment of the Board of Directors on December 23, 2016**

39.     Effective December 23, 2016, the Company completed the acquisition of XpresSpa Holdings, LLC ("Old XpresSpa"), the owner and operator of the Wellness Business. Among other things, the Company acquired by way of the merger the Wellness Business, including its accompanying Lease Portfolio and the intellectual property and goodwill associated with the XpresSpa® brand.

40.     In connection with the merger, the Company assumed the obligations under the Rockmore Note and recognized the principal balance of that obligation, $6.5 million, on its books as a long-term liability. The Company disclosed that Rockmore was controlled by Bernstein. The Company failed to disclose that Abbe held a financial participation interest in the Rockmore Note.

41.     Effective December 23, 2016, Bernstein, Abbe, Heyer, Perlman, Donald E. Stout and John Engelman assumed their roles on the Board of Directors of the Company.

**D.  The Interested Directors**

42.     Under Delaware law, actions of a Board of Directors are not entitled to the protections of the business judgment rule unless the challenged actions have been approved by a majority of the Board of Directors consisting of disinterested directors. From December 23, 2016 through December 2018, Bernstein, Abbe, Perlman, Giardina, and Heyer formed a majority of the Board of Directors, but at all times during that period failed to meet the standard of disinterestedness required to qualify for application of the business judgment rule. From the time of Abbe's resignation in December 2018 to the present, Bernstein, Giardina, and Heyer formed a majority of the Board of Directors, but at all times during that period failed to meet the standard of disinterestedness to qualify for application of the business judgment rule.

43.     First, each of Bernstein, Perlman, Giardina, and Abbe have relied on and personally benefited from a longstanding co-investment relationship with each other and Daly (altogether, the

"Co-Investment Group"). Each of Bernstein, Perlman, Giardina, and Abbe has individually received personal wealth and lucrative investment opportunities by way of their longstanding relationship and affiliation as members of the Co-Investment Group. Because of the history of benefits received as a result of their relationship and affiliation with the Co-Investment Group, each of Bernstein, Perlman, Giardina, and Abbe has a strong and powerful incentive to place the interests of the Co-Investment Group before their respective duties of loyalty to the companies on whose boards they serve.

44.     The extent and nature of the interest each of Bernstein, Perlman, Giardina, and Abbe has in advancing the objectives of the Co-Investment Group are evidenced by their historical activities concerning other public companies. Ordinarily, one or more members of the Co-Investment Group first take a foothold position on the board of a target company by way of the acquisition of a substantial ownership of the target company's stock or by causing one of their investment vehicles to enter into a convertible debt facility or other debt financing on coercive terms (similar to the Rockmore Note).

45.     Following the initial investment, it has been the practice of the Co-Investment Group to use its initial foothold position on the board to cause other members of the Co-Investment Group to be appointed to the Board of Directors of the target company.  Once one member of the Co-Investment Group is appointed to a board, other members of the group are quickly appointed to directorships until the Co-Investment Group attains the power to control the affairs of the target company.

46.     Members of the Co-Investment Group are then appointed to the Audit and Compensation Committees of the target company.  Once the Co-Investment Group have effected

a change of control, they grant themselves valuable compensation and otherwise use the target company to refinance the initial investment on favorable terms.

47.     The Co-Investment Group, acting through various investment vehicles, have implemented schemes to effect changes of control or other coordinated activities with respect to National Holdings Corporation ("NHC"),[3] Neurotrope, Inc. ("Neurotrope"), GeoResources, Inc., USA Technologies, Inc., and TapImmune, Inc.

48.     To effect these schemes, the Co-Investment Group have used various investment vehicles, such as Rockmore (controlled by Bernstein) and Iroquois[4] and ACM (both investment vehicles controlled or beneficially owned by Abbe) to coordinate their control over target companies.

---

[3]     For example, in 2014, Salvatore Giardina held a foothold directorship in NHC. Abbe and a business partner from Iroquois sent a notice of intent to nominate a slate of three directors to stand for election at the upcoming annual meeting to the board of directors. Following this notice, NHC agreed to an investor settlement agreement that, inter alia, caused Abbe to be appointed to the board of directors and the board to nominate Abbe's Iroquois business partner as a director. Upon the declination of one current director to stand for re-election and the resignation of another board member immediately following the annual meeting, the board of NHC formed a strategy committee to be comprised of six non-management members, including either Abbe or his Iroquois business partner, *inter alia*. Giardina, by way of his undisclosed arrangement with Abbe, remained on the board after the investor settlement agreement. Abbe and his business partner, as well as Giardina, then voted as directed by Abbe and another Iroquois partner, for the purpose of exercising control over the affairs of NHC. Immediately following the Annual Meeting in July 2014, the newly-formed Strategy Committee included Abbe, his Iroquois business partner, and Giardina.  In or about September 2016, Abbe and Giardina caused NHC to complete a tender offer by a subsidiary of Fortress Biotech, Inc., receiving a premium in exchange for their initial investment while diluting the existing shareholders of NHC.

[4]     Bernstein, and Abbe used similar means to effect a change of control of a public company named Neurotrope, Inc. ("Neurotrope"). Neurotrope is a startup biotechnology company that licenses its core technology from another entity. First, Abbe caused Iroquois to take a 9.99% beneficial interest in Neurotrope.  Then, in connection with a public offering disclosed in July 2016, Abbe caused Iroquois to commence litigation against Neurotrope.  Abbe agreed to settle the litigation in exchange for an increase in the size of the board of directors and the appointment of a fellow Iroquois partner to the board of directors of Neurotrope.  Shortly thereafter, the board was increased again and, on November 14, 2016, Bruce Bernstein was appointed as a director of that company. Pursuant to the undisclosed arrangement between Abbe and Bernstein, Bernstein was appointed as the Chairman of the Audit Committee and also a member of the Compensation Committee, Nominating, and Corporate Governance Committees of the board. In short order, Perlman was also elected as a director and appointed to the Audit and Compensation Committees.  Bernstein, Perlman, and Abbe's fellow Iroquois partner all voted to award to themselves, and continue to receive, valuable shares of Neurotrope stock.

49.    Over the years, each member of the Co-Investment Group has gained personal benefit, including cash and equity compensation, from their respective membership and participation in the activities of the Co-Investment Group. Accordingly, each member of the Co-Investment Group has a substantial financial interest in remaining a member of and aiding and abetting future activities of the Co-Investment Group.[5]

50.    For each member of the Co-Investment Group, the importance of maintaining a continued relationship with the Co-Investment Group outweighs the fiduciary duty of loyalty they owe to the target company for which the specific member of the group serves as a director. For example, in prior proceedings, Abbe's financial interest in the Rockmore Note was publicly revealed by way of the unsealing of a document produced by Bernstein's ex-wife. Following the public disclosure of this document in 2018, the Co-Investment Group excluded Bernstein's longstanding business partner, Daly, from participating in their activities concerning Dropcar, Inc., a public company listed on NASDAQ, by removing Daly from the board of directors of that company. Bernstein then commenced a civil action against his ex-wife seeking damages for "lost profits."

51.    Second, Bernstein, Abbe, and Daly have significant interests in the transactions relating to the Rockmore Note. At the same moment Bernstein and Abbe assumed their positions as directors, on December 23, 2016, the Rockmore Note became an obligation of the Company. At that time, Bernstein controlled the Rockmore Note and Abbe and Daly held substantial personal financial interests by way of their participations in the Rockmore Note. Bernstein was also interested in the Rockmore Note through his longstanding relationship with Daly from which Bernstein has generated and received personal benefit.

---

[5]    *See* Doc. No. 1, Complaint, *Bruce T. Bernstein v. Sheryl Aufrichtig*, Index No. 65212-2019 (Sup. Ct. New York Cty)

52.     Third, by his close relationship with the Co-Investment Group and in exchange for voting in favor of their proposed transactions, Heyer was afforded the ability to maintain substantially the same equity position relative to the other investors in the Company, even as the other shareholders experienced substantial dilution. Thus, Heyer had the motive and opportunity to vote and act in accordance with the interests of the other Interested Directors and against the interests of the other shareholders.

**E.  The Deceptive Characterization of the Value of the Lease Portfolio as Goodwill**

53.     The Wellness Business, and accompanying Lease Portfolio, represent one of the largest portfolios of airport concession leases in North America with an estimated value of $40 million as of December 23, 2016.

54.     Upon installment of the Board of Directors on December 23, 2016, Bernstein and Abbe were aware of, and knew the true value of the Wellness Business and, indeed, desired to convert the value of the asset for themselves. Bernstein and Giardina were also aware of the Lease ASU and, therefore, they knew that beginning in 2019 the Company would be required to recognize on its balance sheet a separate asset reflecting the Lease Portfolio that accompanies the Wellness Business.

55.     Pursuant to the Lease ASU, the Company was obligated to transition from the prior GAAP standards for accounting for long-term leases to the new standards reflected in the Lease ASU and that in order to do so, the Company was entitled to "early adopt" the standards of the Lease ASU that would require recognition of the Lease Portfolio on the balance sheet. An ideal time to recognize on the books a right-to-use asset reflecting some of the value of the Lease Portfolio was after the close of the merger on December 23, 2016.

56.     Notwithstanding this knowledge, Bernstein and Giardina elected to not separately recognize on its balance sheet the value of the Lease Portfolio as a separate asset. Instead, the

Company reported as good will $18 million of the $37.5 million consideration for the merger. In light of the Lease Portfolio's market value of approximately $19 to $40 million, substantially all of the goodwill recognized in connection with the merger comprised the value of the Lease Portfolio that otherwise could have been recognized as a "right-to-use" asset.

57.     Bernstein and Giardina had the discretion, in their capacities as majority members of the Audit Committee, to early adopt the Lease ASU and recharacterize a portion of the goodwill as a "right-to-use" asset on the books of the Company. Bernstein's and Giardina's  failure to characterize a portion of the value of the Lease Portfolio as a "right-to-use" asset, without also disclosing that the Company would be required to do so within two years, was deceptive because doing so subjected the Lease Portfolio, a substantial portion of the Company's assets, to annual impairment testing under the goodwill standard instead of under the standards provided under the Lease ASU.

58.     Bernstein and Giardina, as majority members of the Audit Committee, had the discretion to correct the misleading nature of the foregoing characterization of the Lease Portfolio by disclosing the fair value of the Lease Portfolio in notes to the Company's financial statements. The omission of this information from the Company's reports filed with the SEC and disseminated to the market, was deceptive and misleading.

**F.  The Interested Directors' Actions Artificially Depressed the
    Stock Price and Market Capitalization of the Company**

59.     After the merger, Bernstein, Abbe, Giardina, and Heyer used their control and power over the Company to cause the Company to take certain actions designed to dilute stockholders and drive down the share price and market capitalization of the Company, with no compelling benefit to the stockholders that would offset the cost of dilution.

60.     Knowing that by way of their interests in the Rockmore Note, Bernstein and Abbe

had full control over and a security interest over the Wellness Business, and its Lease Portfolio, Bernstein and Abbe knew that driving down the stock price and market capitalization to an amount below the principal balance of the Rockmore Note would result in a opportunity to obtain for themselves the majority of the value of the Wellness Segment (including the Lease Portfolio) by positioning the Company for a default under the Rockmore Note, a conversion of the Rockmore Note into a super-majority of common stock, or a take-private transaction.

### i.   The 2017 Equity Offering

a.   On July 26, 2017, the Company entered into an underwriting agreement with Roth Capital Partners, LLC to underwrite the issuance and sale of 6,900,000 shares of common stock at a 7% discount (the "2017 Equity Offering").

b.   The sale of the 2017 Equity Offering realized cash proceeds of approximately $6,584,000. The purported purpose of the 2017 Equity Offering was to obtain proceeds to acquire new long-term leases for airport concession venues. Yet the Company failed to realize any value from the proceeds generated from the sale of the 2017 Equity Offering. The Company failed to acquire any material number of new long-term lease locations, it reported no new assets, no material improvement in results, and its cash on hand actually fell during the period during which the notes were sold.

c.   Notably, the Interested Directors used none of those proceeds to pay down any portion of the principal balance of the Rockmore Note.

d.   The net effect of the 2017 Equity Offering was to further dilute the existing shareholders, thereby causing the stock price to fall, with no compelling benefit to stockholders for the cost of dilution.

### ii.   The Convertible Notes

a.      On May 15, 2018, the Company issued a press release, also filed with the S.E.C.,

stating, *inter alia*, the following:

> On May 15, 2018, the Company entered into a securities purchase agreement
> (the "Agreement") with certain institutional investors (the "Investors"), pursuant
> to which the Company agreed to sell up to (i) an aggregate principal amount of
> approximately $4.4 million in 5% Secured Convertible Notes (the "Convertible
> Notes"), which includes approximately $0.1 million to be issues to Palladium
> Capital as Placement Agent in the offering, convertible into shares of common
> stock of the Company, par value $0.01 per share ("Common Stock") at a
> conversion price of $0.62 per share, (ii) Class A Warrants (the "Class A
> Warrants") to purchase approximately 7.2 million shares of Common Stock at
> an exercise price of $0.62 per share and (iii) Class B Warrants (the "Class B
> Warrants," and together with the Class A Warrants, the "Warrants") to purchase
> approximately 3.6 million shares of Common Stock at an exercise price of $0.62
> per share. The Convertible Notes bear interest at a rate of 5% per annum. The
> Convertible Notes are senior secured obligations of the Company and are
> secured by certain of its personal property. Unless earlier converted or
> redeemed, the Convertible Notes will mature in November 2019. **The Company
> intends to use the proceeds of this financing primarily for working capital
> and new store openings.** The Company expects to close the transaction as soon
> as possible following the filing of the first quarter 2018 results.
>
> On May 14, 2018, we extended maturity of the debt from May 1, 2019 to
> December 31, 2019.[6]

(*See* Press Release,[7] attached as Ex. B)

b.      The Company filed its Form 10Q for the first quarter on May 15, 2018. The Form

10Q is signed by its then-CFO, Anastasia Nyrkovskaya. The Form 10Q describes the

convertible note issuance, but does not include any mention that Rockmore or B3D has agreed

to waive its senior secured status or had received a grant of warrants in exchange for such an

agreement. (*See* Ex. E).

---

[6] Plaintiffs understand this sentence to be a reference to the Rockmore Note, but there is no mention of the Rockmore
Note in the press release.
[7] https://www.sec.gov/Archives/edgar/data/1410428/000114420418028894/tv494143_ex99-1.htm

      c.      On May 16, 2018, Bruce Bernstein filed a Form 4 with the S.E.C., which stated the following in footnotes:

> 1. The Class A Warrants were issued as consideration for the Reporting Person's execution of a consent and waiver in connection with the Issuer's private placement of 5% Secured Convertible Notes due 2019, Class A Warrants and Class B Warrants.

> 2. These securities are held by Rockmore Investment Master Fund Ltd., an investment entity controlled by Bruce T. Bernstein.[8]

      d.      In the same May 15, 2018 press release, Ed Jankowski, then-C.E.O. made the following statement:

> "XpresSpa is close to generating sufficient cash to fund operations through the combination of operating the spas and our cost reduction initiatives particularly as we approach the seasonally stronger second and third quarters of the year," said Mr. Jankowski. "While we consider our operating and growth needs to be fully funded through the end of 2019, as we move forward, we will continue to review our capital structure and our options to increase our financial flexibility, including the refinancing of our existing debt, and the reduction of our cost of capital."

(Ex. B)

      e.      The sale of the Convertible Notes realized proceeds of $4,350,000 for the purported purpose of acquiring new long-term leases for airport concession venues. The Convertible Note investors included Alpha Capial Anstalt, Anson Investments Master Fund LP, L1 Capital Global Opportunities Master Fund, Intracoastal Capital, LLC, The Hewlett Fund LP, Brio Capital Master Fund Ltd.

---

[8] It is unclear why securities would be issued to Rockmore in 2018 in relation to a waiver of rights relating to the Rockmore Note given that Rockmore, purportedly, had transferred rights to the Rockmore Note to B3D in 2017. In addition, a letter submitted to the S.E.C. by its counsel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., on July 10, 2018, states: "In connection with the Offering, the Company agreed to issue to B3D, LLC Class A warrants to purchase common stock in consideration for B3D, LLC's agreement to extend the maturity of the Company's existing senior secured note to December 31, 2019, the waiver of certain rights of Rockmore Investment Master Fund Ltd. And B3D, LLC under the Company's existing senior secured note and the consent to the issuance of the Securities pursuant to the Purchase Agreement." See Letter to S.E.C. https://www.sec.gov/Archives/edgar/data/1410428/000114420418037862/filename1.htm, attached here to as Ex. F.

f.      The Company failed to realize any value from the proceeds generated from the sale of the Convertible Notes. The Company failed to acquire any material number of new long-term lease locations, it reported no new assets, no material improvement in results, and its cash on hand fell during the period during which the notes were sold.

g.      Notably, the Interested Directors used none of those proceeds to pay down any portion of the principal balance of the Rockmore Note.

h.      The net effect of the convertible notes was to further increase the debt on the books of the Company and further dilute the existing stockholders, thereby causing the stock price to fall further, with no compelling benefit for stockholders for the cost of dilution.

i.      In addition, the Company failed to include certain material information in relation to the Convertible Note private placement. First, in connection with the Convertible Notes, the Company had granted Bruce Bernstein (either via Rockmore or B3D) an additional 250,000 Class A Warrants as consideration to secure B3D's consent to the transaction and waiver of certain rights. The Company failed to disclose this fact until June 8, 2018, when it disclosed for the first time, in a Form S-3 Registration Statement signed by Bernstein, Abbe, Heyer, and Giardina, this material and relevant information concerning the Convertible Notes.

j.      Second, the Company, represented to the S.E.C., in a July 10, 2018 letter from its attorney, Kenneth R. Koch, at Mintz Levin, that "[t]o the best of the Company's knowledge, there are no relationships among the selling shareholders." (*See* Ex. G.) Yet Abbe (via his investment vehicle(s), including Iroquois) and Intracoastal Capital, LLC have both participated as investors in at least 10 public companies in recent years, including, but not limited to: Inpixon, CareDx, Inc., Paretum Corp., Real Goods Solar, Inc., Spring Bank Pharmaceuticals, Inc., Innovate Biopharmaceuticals, Inc., Sino-Global Shipping America ("SINO"), Ltd.,

Cellectar Biosciences, Inc. ("Cellectar"), Apricus Biosciences, Inc., and Genius Brands International, Inc. ("Genius"). Mintz Levin acted as counsel to Genius. Anson Investments Master Fund LP ("Anson") also participated as an investor in Inpixon, SINO, Cellectar, and Genius. These circumstances suggest that there is a co-investing relationship between and among at least Abbe, Intracoastal, and Anson that Abbe knew of when the Company sent its July 10, 2018 letter to the S.E.C. and which should have been reported.

### iii.   The Fraudulent Goodwill Impairment

a.      On May 15, 2018, the Company reported a goodwill impairment of $19.6 million (the "Goodwill Impairment"), comprising substantially all the goodwill of the company resulting from the acquisition of the Lease Portfolio.

b.      This goodwill impairment was false and misleading because, as described above, substantially all of the goodwill should have been re-characterized as a separate "right-to-use" asset representing the value of the Lease Portfolio and the Company had not disposed of the Lease Portfolio. Thus, there was no legitimate basis to write-down all of the goodwill.

c.      Bernstein and Giardina, as majority members of the Audit Committee, should have re-characterized substantially all of the goodwill recognized on the Company's books from the merger into a new "right-to-use" asset on the balance sheet. But they knew that they were not required to comply with the Lease ASU, by recognizing the value of the Lease Portfolio as a separate asset, until 2019. Thus, declining to do so in the interim, and characterizing the majority of the value acquired by way of the merger as goodwill that could be fully impaired in the meantime, presented to Bernstein an opportunity to commit fraud by artificially depressing the stock price.

d.      Although Bernstein and Giardina knew the true market value of the Wellness Business and its Lease Portoflio,  $19 million to $39 million, they omitted any reference to the value of this asset while writing off entirely the Company's goodwill in filings with the SEC.

e.      Predictably, the goodwill impairment resulted in a massive decline in the stock price and an increase in short interest in the Company's stock.

   iv.    **Efforts to Expropriate the Value of the Lease Portfolio by Engineering a Default of the Rockmore Note**

61.      After Abbe resigned in December 2018, Bernstein, Giardina, and Heyer formed a majority of the Board of Directors. They used their control and power over the Company to cause the Company to take certain actions designed to dilute stockholders and drive down the share price and market capitalization of the Company, with no compelling benefit to the stockholders that would offset the cost of dilution.

a.      On April 1, 2019, the Company filed its Form 10-K for the fiscal year ending December 31, 2018. The 10-K revealed the 2019 Interested Directors' first steps to exploit for their own gain the efforts they had undertaken the drive down the stock price and market capitalization of the Company.

b.      In the 10-K, the Bernstein, Giardina, and Heyer reported for the first time that the Company's auditors had issued a going concern notice as a result of the upcoming expiration of the term of the Rockmore Note.

c.      The Rockmore Note provides for certain covenants requiring the Company to provide, on an annual basis, audited financials without any qualifications as to whether there exist doubts as to the status of the Company as a "going concern," *i.e.,* whether it can satisfy its obligations on an ongoing basis.

d.      The specific terms of the Rockmore Note, however, give rise to the motive and opportunity for self-dealing by Bernstein, aided and abetted by Abbe[9] and Daly. More specifically, the original term of the Rockmore Note was two years initially ending on December 31, 2017. In 2016, Rockmore agreed to extend the term for an additional year. However, a one-year extension effectively precludes the Company from complying with the "going concern" covenant because in order to do so, the Company would need to demonstrate to its auditors that it could pay off the Rockmore Note in full before the end of the extended term.

e.      The actions of the Interested Directors from December 23, 2016 to the spring of 2019 had caused the Company's cash on hand to drop from approximately $17 million to far less than $6.5 million and, therefore, the Company was not able to demonstrate that it could pay off the Rockmore Note in full and the Company's auditors would necessarily need to issue a going concern advisory.

f.      In any year when Rockmore declined to extend the term of the Rockmore Note, the Company's auditors would be forced to issue a going concern qualification in the financials reported to Rockmore because the full principal of the note would become due within less than one year from the date of the audited financials and, therefore, the obligations under the note would become a current liability affecting the Company as a going concern. If, on the other hand, Bernstein elected to extend the term, then the obligations under the note would remain a long-term liability that would not require the auditors to issue a going concern qualification.

---

[9] Upon information and belief, Abbe continued to hold indirectly a financial participation interest in the Rockmore Note at this time. The true nature of Abbe's participation interest in the Rockmore Note is uniquely within the possession of Abbe, Bernstein, and/or Daly.

g.     Thus, by choosing whether or not to extend the term, Bernstein, aided and abetted by Abbe and Daly, could engineer a default of the note. If Bernstein, Abbe, and Daly elected to engineer a default, they could then proceed to execute on the security interest over the Lease Portfolio, thereby effecting a transfer of the Wellness Business to Bernstein, Abbe, and Daly, through their interests in Rockmore and B3D.

h.     The Company has never defaulted on its payment obligations to Rockmore. The default threatened in the 2018 Form 10-K[10] was engineered by Bernstein while he also served in the capacity as Chairman of the Board of Directors.

i.     On April 29, 2019, the Hon. Louis L. Stanton, U.S. District Court Judge, S.D.N.Y., temporarily restrained Bernstein from permitting or suffering the declaration of default under the Rockmore Note.

   v.   **Amendments to the Convertible Notes; Insider Trading; Efforts to Convert the Rockmore Note**

a.     On May 15, 2019, the Company issued its financial results for the first quarter 2019, recognizing for the first time a "right-to-use" asset on its balance sheet. However, it recognized an asset valued at only $9.6 million. This value underestimates the true value of the "right-to-use" derived from the Lease Portfolio.

b.     By May 15, 2019, substantially all of the principal and interest of the Convertible Notes had already been converted into common stock. However, the remaining balance owed under the Convertible Notes had priority over the security interest of the Rockmore Note. Thus, Bernstein, aided and abetted by Abbe and Daly, had a motive to induce the holders of the

---

[10] In the 10-K, the Interested Directors also reported for the first time that they intended to begin recognizing a "right-to-use" asset on the Company's balance sheet. However, they reported to expect the value of this asset to be only in the $10 to $12 million range, far lower than a reasonable estimate of the value of the "right-to-use" asset.

Convertible Notes to convert their debt to common stock and make the Rockmore Note security interest the most senior.

c.      As of early June 2019, however, the conversion price of the Convertible Notes was higher than the market price of the stock. Accordingly, Bernstein, assisted by the other interested directors, Giardina and Heyer, engaged in a scheme to induce the holders of the Convertible Notes to convert their remaining balances into common stock.

d.      On June 25, 2019, the price of the Company's stock closed at $1.82. Between June 25, 2019 and open of the market on the morning June 26, 2019, the volume of short interest in the Company's stock rose from 1,180 to 2,877,376, exceeding the total number of shares issued and outstanding.

e.      The magnitude of short interest created a short squeeze causing the price of the stock to skyrocket on June 26, 2019 to as high as 158% from the prior close. That day, the stock closed at $4.71, representing a gain of 129% from the last close. No news concerning the Company had been reported.

f.      On June 27, 2019, at 9:00 a.m., the Company issued a Form 8-K disclosing that effective that morning it had entered into agreements with holders of the Convertible Notes to convert all of the remaining balances of those notes by no later than 4:00 p.m. June 28, 2019.

g.      The agreement provided for a reduced conversion price of $2.48 per share. Thus, this conversion would be profitable for the holders of the Convertible Notes only if the price of the stock rose above $2.48 per share. Before the Company's filing of the Form 8-K on June 27, 2019, the existence of negotiations between the Company and the holders of the Convertible Notes, and the new conversion price, constituted material non-public information.

h.      Bernstein, Giardina, or Heyer allowed non-public material information concerning the agreements with the Convertible Noteholders to be disclosed before the open of the market on June 26, 2019 and before disclosure to the investing public in general. As reported by user "TitoMojito" on the XpresSpa forum on the trading website stocktwits.com:

> $XSPA we fuckin did it boys. Huge shout out to @gstockz who let me know about this short play real-time yesterday [June 26, 2019]. It was a nice play to begin with leading into pre-market, but that early morning 8-K was the icing on the cake. . . .

i.      Bernstein had the motive and opportunity to disclose this information prior to June 27, 2019. Indeed, those with interest in the Rockmore Note—Bernstein, Daly, and, likely, Abbe—had substantial motivation to ensure that the holders of the Convertible Notes were incentivized to convert their notes so that the B3D could re-establish its status as the senior, secured creditor of the Company.

j.      In the June 27, 2019 Form 8-K, the Company disclosed for the first time that it was negotiating with Daly and B3D to convert up to $3,000,000 of principal and interest of the Rockmore Note into common stock and warrants. Both the negotiation of an early conversion of the Convertible Notes and disclosure of material non-public information that would incentivize the holders of those notes to agree to convert presented a motive and opportunity for Bernstein (and Abbe and Daly) to release material non-public information before issuance of the Form 8-K on the morning of June 27, 2019.

k.       On June 28, 2019, the stock closed at $1.94. The early conversion of the Convertible Notes caused further dilution of existing stockholders with no compelling benefit to stockholders for the cost of dilution.

l.      The circumstances suggest that Bernstein, Giardina, and Heyer, either directly or indirectly, knowingly caused the shares of the Company to increase significantly on June 26,

2019 for the purpose of falsely inflating the size of the Company's shelf offering. Specifically, on July 31, 2019, the Company filed a Rule 425b Prospectus stating:

> As of July 26, 2019, the aggregate market value of our common stock held by non-affiliates pursuant to General Instruction I.B.6. of Form S-3 was approximately $13.1 million, which was calculated based on 2,916,919 outstanding shares of our common stock, of which 2,781,162 shares are held by non-affiliates, and a **price of $4.71 per share**, the closing sale price of our common stock reported on The Nasdaq Capital Market on **June 30, 2019**. As a result, we are currently eligible to offer and sell up to an aggregate of approximately $4.3 million of our securities pursuant to General Instruction I.B.6 of Form S-3. During the prior twelve calendar month period that ends on the date of this prospectus, we did not offer securities pursuant to General Instruction I.B.6 on Form S-3. Pursuant to General Instruction I.B.6 of Form S-3, in no event will we sell shares pursuant to this prospectus with a value of more than one-third of the aggregate market value of our common stock held by non-affiliates in any 12-month period, so long as the aggregate market value of our common stock held by non-affiliates is less than $75 million. [emphasis added]

Attached as Ex. C[11]

m.     This statement is misleading and demonstrably false. June 30, 2019 was a Sunday. The closing price of XSPA on immediately preceding trading day, June 28, 2019, was $1.94. Other than June 26, 2019, the closing price of XSPA had not been greater than $4.00 since March 12, 2019.

n.     Heyer, Bernstein, and Giardina were motivated to substantially increase the price of XSPA's stock on June 26, 2019 because a higher stock price would substantially increase the number of shares that could be offered for sale. For example, based on the closing price of the stock on June 25, 2019 or June 27, 2019, the Company would have been able to offer for sale shares with a total market value of less than $2 million. By artificially boosting the price above $4.00 on June 26, 2019, the Company now intends to offer for sale shares with a total market value of up to $4.3 million.

---

[11] https://www.sec.gov/Archives/edgar/data/1410428/000114420419036737/tv525988_424b2.htm

o.    In addition, as detailed in the attached expert report of Professor John Finnerty, the increased stock price on June 26, 2019 acted as an inducement for the holders of the convertible notes issued in May 2018 to convert their remaining outstanding notes. (*See* Ex. A.)

p.    On July 8, 2019, the Company also amended its Series A warrants to (i) reduce the exercise price of the Class A Warrants to $2.00 per share, (ii) remove the exercise price floor, and (iii) allow for the voluntary reduction of the exercise price by the XpresSpa's Board of Directors at any time at its discretion.[12] In addition, the Company made other amendments the effect of which will result in dilution to existing shareholders.

q.    By way of their self-interested transactions in 2019, the Bernstein, Heyer, and Giardina breached their fiduciary duties to the Company and caused massive dilution to stockholders, thereby causing further declines in the stock, with no compelling benefit to stockholders to justify the cost of dilution.

## G. The Business Judgment Rule Does Not Apply to the Actions of the Interested Directors

62.    Bernstein, Heyer, Giardina, Perlman, and Abbe were self-interested when they voted in favor of or otherwise approved the 2017 Equity Offering. Bernstein, Heyer, Giardina, and Abbe were self-interested when they voted in favor of or otherwise approved the issuance of the 2018 Convertible Notes and the Goodwill Impairment. Bernstein, Heyer, and Giardina were self-interested when they voted in favor of or otherwise approved the amendments in June 2019 to encourage early conversion of the Convertible Notes and other transactions in June 2019.[13]

---

[12] Abbe has not filed with the S.E.C. any reports disclosure the sale of any of the warrants he held during this tenure as a director. Accordingly, the 2019 amendments to the Company's warrants are effectively close the loop on an undisclosed *quid pro quo* to Abbe for his actions during his tenure as a director.

[13] Abbe was also interested in the 2017 Equity Offering and 2018 Convertible Note private placement. He is not currently a director and would not play a role in deciding whether the Company would bring this lawsuit. Thus, Abbe's interest in the transactions is not relevant for the purpose of considering the application of the business judgment rule to determine demand futility.

63.     When the Board of Directors approved each of these transactions, Bernstein, Heyer, Giardina, and Abbe (until Abbe's departure from the Board in December 2018) and Bernstein, Heyer, and Giardina (after Abbe's departure from the Board in December 2018)[14] together formed a majority of the Board of Directors but failed to meet the standards of disinterestedness required for application of the business judgment rule. Bernstein failed to meet the requisite standards of disinterestedness because of his direct and/or indirect interest in driving down the value of the stock and market capitalization of the Company while failing to apply any of the proceeds of the proceeds of these transactions towards payment of the principal on the Rockmore Note. Abbe, Heyer, and Giardina failed to meet the requisite standards of disinterestedness because of their fealty to Bernstein and their interest in acquiring stock at artificially depressed prices. Abbe failed to meet the requisite standards of disinterestedness for the additional reason that he likely continued to hold a beneficial interest in the Rockmore Note for at least some portion of the Relevant Period.

64.     While each of these transactions contributed to, and resulted in, the drastic fall in the stock price, the 2017 Equity Offering and the Convertible Notes generated over $10,350,000 in cash proceeds for the Company and caused massive dilution of existing stockholders. The Company used none of those proceeds to pay down any portion of the Rockmore Note. Instead, from the close of the merger through the present, the principal balance of the Rockmore Note remained $6,500,000 and is set to increase to $7,000,000 if the shareholders vote in favor of the Company's current proposal.[15] The company received no compelling benefit to justify the cost to stockholders of the dilution caused by these actions.

---

[14] There were 7 members of the Board of Directors in the years 2017 and 2018 and 5 members from 2018 to the present.
[15] *See* proxy statement dated August 9, 2019, annexed hereto as Ex. D.

65.     Once the market capitalization fell below the principal balance of the Rockmore Note, the Bernstein, and Daly (and likely Abbe) could then either foreclose on the Wellness Business (including the Lease Portfolio) by way of B3D's security interest, or convert some or all of the principal balance of the Rockmore Note into a super-majority of the Company's common stock. At the same time, Bernstein, Heyer, and Giardina would be able to acquire substantial amounts of the common stock, or warrants for common stock, at artificially deflated prices.

66.     Afterwards, the Bernstein, Heyer, and Giardina would be in a position to cause the Company to recognize on its books the full value of the Wellness Business and its Lease Portfolio and, thereby, drive the price of the stock back up or engage in a take-private transaction.

67.     Between January 4, 2017 and June 25, 2019, the stock price fell from $42.79 to $1.82 per share. Market capitalization fell from $40 million to approximately $3.7 million.

68.     The following chart shows the toxic effect of scheme orchestrated by Bernstein, Heyer, Abbe (during this tenure as a director), and Giardina to drive the company into insolvency:

| Date | Cash Realized by Fin'g Activities: | Cash on Hand | Leases | Stock Price[16] | Shares Issued and Outstanding | Market Cap[17] | Rockmore Note Prin. Balance |
|---|---|---|---|---|---|---|---|
| December 30, 2016 | $0.00 | $17,910,000 | 53 | $42.60 | 18,304,881 | $38,989,396 | $6,500,000 |
| March 31, 2017 | $0.00 | $11,673,000 | 53 | $43.40 | 19,198,454 | $41,660,645 | $6,500,000 |
| June 30, 2017 | $0.00 | $7,958,000 | 52 | $33.00 | 19,565,531 | $41,660,645 | $6,500,000 |
| September 31, 2017 | $6,130,000 | $10,072,000 | 51 | $27.80 | 26,540,690 | $36,898,509 | $6,500,000 |
| December 31, 2017 | $0.00 | $6,368,000 | 56 | $27.40 | 26,545,690 | $35,040,310 | $6,500,000 |
| March 31, 2018 | $0.00 | $3,554,000 | 57 | $14.40 | 26,634,475 | $19,176,822 | $6,500,000 |
| June 30, 2018 | $4,350,000 | $4,458,000 | 57 | $5.80 | 27,114,662 | $7,863,251 | $6,500,000 |
| September 31, 2018 | $0.00 | $2,525,000 | 57 | $3.00 | 31,919,511 | $4,787,926 | $6,500,000 |
| December 31, 2018 | $2,000,000 | $3,403,000 | 56 | $3.20 | 1,761,802[18] | $5,637,766 | $6,500,000 |
| March 31, 2019 | $0.00 | $3,312,000 | 55 | $2.40 | 1,941,341 | $4,659,218 | $6,500,000 |
| June 25, 2019 | $0.00 | $3,312,000 | 55 | $1.89 | 1,941,341[19] | $3,669,134 | $6,500,000 |

69.     During this period, Bernstein, Heyer, Abbe, and Giardina purchased and/or were awarded stock, warrants for the issuance of stock, and/or options at prices that were artificially depressed by way of the self-interested actions described above.

70.     Engaging in a take-private transaction of the Wellness Business, or full recognition of value of the Lease Portfolio, would drive up the stock price and the value of the stock and other securities (i.e., warrants) obtained by Bernstein, Abbe, Heyer, and Giardina at artificially depressed prices.

## V.     DUTIES OF THE INTERESTED DIRECTORS

### A. Fiduciary Duties

71.     Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director), because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

---

[16]     Adjusted for 20-to-1 reverse split effective February 22, 2019.
[17]     18,304,881 shares issued and outstanding as of December 31, 2016. 26,545,690 shares issued and outstanding as of December 31, 2017. 1,761,802 shares issued and outstanding as of December 31, 2018.
[18]     20-for-1 reverse split.
[19]     Last reported as of March 31, 2019.

By reasons of their positions as officers and/or directors and fiduciaries and because of their ability to control the business and corporate affairs of the Company, the foregoing directors owed to the Company and its stockholders the fiduciary obligations of loyalty, trust good faith, candor, and due care and were required to do the utmost to control and manage the affairs of the Company in a fair, just, honest, and equitable manner. The foregoing directors were required to act in furtherance of the best interest of the Company and its stockholders so as to benefit all stockholders equally, and not in furtherance of their own personal interests or benefit.

72.    Each officer and director of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director) had and have a duty of candor; i.e. to promptly disseminate accurate and truthful information regarding the Company's operations, finances, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information and that the Company's shareholders would be appropriately informed thereof.

73.    In failing to fulfill these duties, Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director) repeatedly and continuously, throughout the Relevant Period, made material misstatements of fact regarding the independence of Abbe, the false and misleading impairment of the Company's goodwill, and commitments that it did not place the self-dealing transactions above the interests of shareholders.

74.    Specifically, in the Company's filings with the SEC, press releases, investor presentations and other public documents, Bernstein, Giardina, Heyer, and Abbe (during his tenure

as a director) misrepresented and omitted, or caused other officers of the Company to misrepresent and omit, material information in breach of their fiduciary duty of disclosure regarding:

      a.     the misleading nature of the goodwill recognized as a result of the merger;

      b.     the Goodwill Impairment; and

      c.     the interest they had in artificially depressing the stock price before full application of the Lease ASU; and

      d.     their individual interests in furthering and continuing their co-investment activities over the interests of the Company.

75.     Material facts have now been disclosed regarding the Company's materially misleading statements during the Relevant Period.

**B. Control Access and Supervision**

76.     Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director), because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various misleading public statements disseminated by the Company.

77.     Because of their advisory, executive, managerial and directorial positions, each of Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director), had access to positive, non-public, and material information about the value of the Company's Wellness Business and Lease Portfolio and had a duty to refrain from misrepresenting the values of those assets while holding an interest in or controlling the Rockmore Note that was secured by those assets.

78.     During the Relevant Period until Abbe's resignation as director in December 2018, Bernstein, Heyer, Giardina, and Abbe were each the agent of each other and of the Company, and were at all times acting within the course and scope of such agency.

79.     After Abbe's resignation in December 2018, Bernstein, Heyer, and Giardina continued to each be the agent of each other and of the Company, and were at all times acting within the course and scope of such agency.

### C. Reasonable and Prudent Supervision

80.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company. By virtue of such duties, Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director) were required to, among other things:

a.  ensure that the Company complied with applicable legal obligations, requirements and regulations, including an appropriate transition to compliance with the Lease ASU, with adequate disclosures, so as to disseminate truthful and accurate statements to the investing public;

b.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with applicable laws, rules and regulations;

d.  properly and accurately guide investors and analysts as to the true financial condition of the Company, including making accurate statements and disclosures about the Company's operations and financial results;

81.     Bernstein, Giardina, Heyer, and Abbe (during his tenure as a director)  breached their fiduciary duty of loyalty and good faith by knowingly, recklessly, and negligently engaging in toxic financing transactions resulting in massive dilution to stockholders,  thereby causing a precipitous decline in the Company's stock price and market capitalization, wasting and

mismanaging the proceeds of those toxic financing transactions, failing to pay down any portion of the principal of the Rockmore Note, declining to early adopt the Lease ASU, improperly failing to transition to the Lease ASU in a way that accurately reflected the "right-to-use" value of the Lease Portfolio, and booking a goodwill impairment of $19 million as of March 31, 2018, otherwise mismanaging the Company so as to drive the market capitalization to decline below the principal balance of the Rockmore Note, attempting to declare a default under the Rockmore Note as of May 1, 2019, and entering into agreements to convert $3 million of the balance of the Rockmore Note in to common stock and warrants for the issuance of common stock at artificially deflated prices. These actions resulted in no compelling benefit to stock holders to justify the cost of dilution.

## VI.   DEMAND FUTILITY

82.     A director's personal financial interest attributable to business interests over which an interested person has substantial influence gives rise to an inference under Delaware law that such a director cannot act independently from the interested person. *See*, *e.g.*, *Marchand v. Barnhill*, No. 533, 2018, 2019 WL 2509617, at *11 (Del. June 18, 2019) ("[Delaware] law has recognized that deep and longstanding friendships are meaningful to human beings and that any realistic consideration of the question of independence must give weight to these important relationships and their natural effect on the ability of the parties to act impartially toward each other"); *Delaware Cty. Employees Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020 (Del. 2015).

83.     Demand to the Board of Directors to commence an action against Bernstein, Heyer, and Giardina concerning the matters alleged herein would be futile because of the long-standing financial relationships between Bernstein, Heyer, and Giardina (who represent the majority of the board as now constituted). Demand futility is further shown by the longstanding, and ongoing, financial (and, likely, personal) relationships between Bernstein, Giardina, and Abbe.

84.     Demand futility is further proven here by the longstanding relationship between Bernstein and Daly in connection with their control and participation in the Rockmore Note. In 2017 Rockmore, controlled at all times by Bernstein, purported to assign the Rockmore Note to B3D for no or insufficient consideration. At that time, Bernstein and Daly were equal members of B3D with Bernstein authorized to act as the "Controlling Director" of B3D. On April 29, 2019, Bernstein purported to transfer to Daly his interest in B3D for no or insufficient consideration.

85.     On June 27, 2019, the Company reported that it was in discussions to convert up to $3 million of the balance of the Rockmore Note into common stock, which is currently trading at the artificially depressed price of $1.82 per share. Imputing the estimated value of the Wellness Business to the number of shares common stock issued and outstanding, the true value of the stock should be somewhere between $10 to $40 per share.

86.     By these transactions Bernstein and Daly are beholden to each other. Bernstein now has an expectation of receiving compensation from Daly in exchange for the transfer of Bernstein's interest in B3D to Daly. Daly has an expectation that Bernstein and Heyer and Giardina will ultimately cause the Company to convert the Rockmore Note into common stock at depressed prices and then drive up the stock.[20] Therefore, none of Bernstein's actions concerning the Rockmore Note qualify as disinterested. Daly's actions constitute aiding and abetting a breach of fiduciary duty.

87.     The actions of the Company in connection with prior proceedings in this action further establish demand futility. On April 24, 2019, Plaintiffs made an application before the Hon. Louis L. Stanton, U.S.D.J., for a temporary restraining order to enjoin Bernstein or anyone acting in concert with him from declaring a default under the Rockmore Note. Because a default under

---

[20] This would permit Bernstein and Daly to obtain for themselves the value of the Wellness business without paying fair value for that asset. *See* e.g., Ex. H.

the Rockmore Note could lead to a possible foreclosure of the Company's Lease Portfolio, the Company necessarily has a strong interest in avoiding any default under the Rockmore Note.

88.     Notwithstanding the Company's substantial interest in avoiding a default under the Rockmore Note, the Company and Bernstein appeared by counsel to oppose Plaintiff's application for a temporary restraining order to enjoin the declaration of a default. The Company opposed the application because it is utterly dominated by Bernstein, Giardina, and Heyer. Accordingly, demand on the Board of Directors would be futile.

## VII.     SECURITIES VIOLATIONS BY BERNSTEIN, GIARDINA, ABBE, AND DALY

89.     In their capacity as members of the Audit Committee, Bernstein and Giardina, together with the other Interested Directors at the time, Heyer and Abbe, caused the Company to falsely misstate the goodwill of the Company as zero while failing to recharacterize any portion of the goodwill as a "right-to-use" asset on the Company's balance sheet, beginning with the Form 10-Q filed for the first quarter of 2018.

90.     These misstatements are material as they resulted in an $18 million charge effective as of March 31, 2018 when the Company's market capitalization was $19 million.

91.     The Company relied on Bernstein and Giardina to truthfully and accurately report its financial condition in reports filed with the SEC and released to investors so that the Company's stock price would be maximized for the benefit of all shareholders.

92.     Bernstein and Giardina acted with scienter because they had both the motive to commit fraud and the opportunity to do so. The acquisition of control over the  highly valuable Wellness Business, and its Lease Portfolio, a few years before the Lease ASU standards became mandatory presented an opportunity to use accounting schemes to depress artificially the share price of the Company. Bernstein was motivated to use accounting misstatements to drive down the share price because he directly or indirectly controlled the Rockmore Note and the security

interest over the Wellness Business and its Lease Portfolio. Driving down the market capitalization of the Company to an amount below the principal balance of the Rockmore Note would position Bernstein and Daly to obtain the majority of the value of the Wellness Business for themselves, either by foreclosure or conversion of the Rockmore Debt into a majority of the common stock of the Company.

93.    Bernstein's and Giardina's statements caused loss to the Company by driving down its share price by more than 95%. During this time, the Company issued common stock, convertible notes, and other securities to Calm, Inc., the Interested Defendants, and others at artificially depressed prices. Had the Interested Defendants truthfully and accurately reported the goodwill or otherwise transitioned to the Lease ASU, the Company would have realized substantially more proceeds from its financing activities during the Relevant Period.

## VIII.    COUNT I

### Breach of Fiduciary Duty against Bernstein, Heyer, Giardina, and Abbe (until Abbe's resignation from the Board of Directors in December 2018)

94.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

95.    As directors of the Company, Bernstein, Heyer, Giardina, and Abbe owed to the Company the fiduciary duties of loyalty, good faith, candor, and due care.

96.    As detailed in full above, in connection with the conduct alleged herein, Bernstein, Heyer, Giardina, and Abbe breached their fiduciary duties of loyalty, good faith, candor, and due care by, *inter alia*, (i) falsely, deceptively, and misleadingly characterizing a substantial portion of the value of the Lease Portfolio as goodwill or otherwise failing to recognize or disclose the value of the Lease Portfolio; (ii) entering into unnecessary or wasteful financing transactions, including the 2017 Equity Offering, the Convertible Notes, and the Goodwill Impairment, with the motive

and opportunity to artificially depress the price of the Company's stock and market capitalization; and (iii) wasting and/or otherwise failing to adequately supervise the application of proceeds from interested financing activities by allowing the Company to fail to pay any principal due under the Rockmore Note, all with no compelling benefit to stockholders for the costs of dilution and other negative effects caused by those transactions.

97.     The foregoing breaches of fiduciary duty proximately caused damage to the Company.

## IX.     COUNT II

### Breach of Fiduciary Duty against Bernstein, Heyer, and Giardina for 2019 conduct

98.     Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

99.     As directors of the Company during 2019, Bernstein, Heyer, and Giardina owed to the Company the fiduciary duties of loyalty, good faith, candor, and due care.

100.     As detailed in full above, in connection with the conduct alleged herein, Bernstein, Heyer, and Giardina breached their fiduciary duties of loyalty, good faith, candor, and due care by, *inter alia*, (i) deceptively engineering a default under the Rockmore Note; (ii) entering into and selectively disclosing agreements to early convert the debt evidences by the Convertible Notes; (iii) seeking to convert $3 million of the indebtedness evidenced under the Rockmore Note into common stock and other securities at artificially depressed prices; and (iv) entering to highly dilutive and self-interest amendments to the Rockmore Note, the Company's Series A and B warrants, and other agreements, all with no compelling benefit to stockholders to justify the cost of dilution and other effects of those transactions.

101.   The foregoing breaches of fiduciary duty proximately caused damage to the Company.

## X.   COUNT III

**Corporate Waste against the Bernstein, Giardina, Heyer, and Abbe**

102.   Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

103.   Bernstein, Giardina, Heyer, and Abbe (until his resignation from the Board in December 2018) breached their fiduciary duties of loyalty by failing to properly supervise and monitor the Company by allowing the Company to engage in an illegal, unethical and improper course of conduct.

104.   As a result of the illicit course of conduct and breaches of fiduciary duty by Bernstein, Giardina, Heyer, and Abbe (until his resignation from the Board in December 2018), the Company has wasted valuable corporate assets through payments of compensation to Bernstein, Giardina, Heyer, and Abbe (until his resignation from the Board in December 2018) because the Company has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of the unlawful course of conduct complained of herein.

105.   In addition, the Company has wasted valuable corporate assets by paying interest at an exorbitant rate on the Rockmore Note and failing to make any payment of interest.

106.   In addition, Bernstein, Giardina, and Heyer have caused the Company to waste valuable corporate assets by agreeing to increase the principal due and owing on the Rockmore Note, despite not having received any additional funds from B3D.

107.   Additionally, the failure of Bernstein, Heyer, Giardina, and Abbe (until his departure from the board in December 2018) to implement adequate internal controls to detect and

prevent the misleading statements regarding the Company's goodwill and bad faith transition to the Lease ASU has caused the Company to suffer a severe depression of its share price.

108.     As a result of the misconduct alleged herein, Bernstein, Heyer, Giardina, and Abbe (for conduct alleged until his departure from the board in December 2018) are liable to the Company.

109.     By reason of the foregoing, the Company was damaged.

## XI.     COUNT IV

### Unjust Enrichment against Bernstein, Daly, Rockmore and B3D

110.     Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

111.     By way of the foregoing, Bernstein, Daly, Rockmore and B3D have been enriched by, *inter alia*, the advancement of cash compensation, equity compensation, and other benefits as described above, including the actions of Bernstein, Giardina, Heyer, and Abbe (during this tenure as director) causing the stock price of the Company to fall precipitously, thereby positioning Bernstein, Daly, and B3D to obtain for themselves (by foreclosure of the security interest, conversion into common stock, a take-private transaction, or otherwise) substantially all of the value of the Wellness Business, including the Lease Portfolio, without paying fair consideration.

112.     Bernstein, Daly, and B3D have failed to compensate the Company for the benefits advanced.

113.     It is contrary to equity and good conscience to allow Bernstein, Daly, Rockmore, and/or B3D to retain the benefits at the expense of the Company and its stockholders.

114.     By way of the foregoing, the Company is entitled to recovery of all amounts by which Bernstein, Daly, Rockmore, and B3D have been unjustly enriched.

## XII.    COUNT V

**Faithless Servant Doctrine against Bernstein, Heyer, Giardina, and
Abbe (for conduct alleged until his departure from the board in December 2018)**

115.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

116.    Each of Bernstein, Heyer, Giardina, and Abbe (during his tenure as director)  acted in the capacity of agents for the Company and, therefore, each of the Interested Directors owed a duty of loyalty and good faith to the Company.

117.    One or more of the Interested Directors breached their duties of loyalty and good faith by engaging in misconduct directly against the interests of the Company or otherwise engaging in disloyal and faithless conduct that substantially violated their respective relationships with the Company.

118.    By way of their faithless and disloyal conduct, the Company has been damaged.

119.    The Company is entitled to recover from Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) all compensation and benefits received by them, directly or indirectly, in connection with their relationships with the Company.

## XIII.    COUNT VI

**Aiding and Abetting against Daly, Rockmore, and B3D**

120.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

121.    By way of the foregoing, the conduct of one or more of Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) resulted in violations of the fiduciary duties owed to the Company and the violations caused damage to the Company.

122.    Daly provide substantial assistance in achievement of conduct that resulted in one or more violations of the fiduciary duties of the Interested Directors, including but not limited to by purporting to assume or otherwise exercising control over the Rockmore Note as more fully described above.

123.    Daly knew or should have known that his provision of substantial assistance would result in violations of the fiduciary duties of one or more of the Interested Directors, or otherwise had the motive and opportunity to provide substantial assistance towards the violation of the fiduciary duties of one or more of the Interested Directors.

124.    By way of the foregoing, the Company has been damaged.

## XIV.    COUNT VII

**Violation of § 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder against
Bernstein, Heyer, Giardina, and Abbe (for conduct
alleged until his departure from the board in December 2018)**

125.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

126.    During the Relevant Period,[21] the Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) have carried out a plan, scheme, and course of conduct, which was intended to, and did: (i) deceive the Company, investors, the market, and existing shareholders, as alleged herein; and (ii) cause the Company to enter into purchases and sales of its securities at prices that had been deflated artificially. In furtherance of this unlawful scheme, plan, and course of conduct, Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) took the actions set forth herein, including but not limited to making, disseminating, and circulating inaccurate and

---

[21] The allegations against Abbe are only made for the period in which he served as a director of XSPA, except where otherwise indicated.

misleading statements concerning the value of the Lease Portfolio, goodwill, and other assets acquired in the merger, writing down the Company's goodwill in a misleading and deceptive manner, omitted to disclose material facts concerning the Lease Portfolio, and causing the Company to enter into financial transactions resulting in massive dilution, thereby causing the price of XpresSpa securities to fall by over 95%, but with no compelling benefit to stockholders for the cost of dilution.

127.   As specifically detailed herein, Bernstein, Heyer, Giardina, and Abbe (during his tenure as director), in violation of §10(b) and Rule 10b-5: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and in an effort to benefit themselves at the expense of shareholders and the Company.

128.   Bernstein, Heyer, Giardina, and Abbe (during his tenure as director), individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal material information about the value of its assets, including the Lease Portfolio, and the interests they had in artificially depressing the price of the Company's stock.

129.   Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to acquire Company securities at artificially depressed prices or to provide to Rockmore, B3D, Abbe, Heyer, Bernstein, and/or Daly opportunities to acquire stock and other securities at artificially depressed prices.  These acts included the making of, or the participation in the making

of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the foregoing not misleading.  As set forth more particularly herein, Bernstein, Heyer, Giardina, and Abbe (during his tenure as director)  further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the Company, Plaintiffs, and other investors. Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. The material misrepresentations and/or omissions of Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) were made knowingly or recklessly and for the purpose and effect of concealing the truth about the foregoing from the investing public.  Bernstein, Heyer, Giardina, and Abbe (during his tenure as director), if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

130.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) awarded to themselves and their acolytes compensation and other amounts at the expense of the Company and its shareholders, the results of which caused damage to the Company and other investors.

131.    At the time of said misrepresentations and/or omissions, the Company reasonably believed them to be true.

132.    Had the Company known the truth regarding the foregoing, which was not disclosed, the Company would not have otherwise sold stock or other securities in connection with

the 2017 Equity Offering, the 2018 Convertible Notes, the 2019 amendments to the Rockmore Note, the 2019 amendments to the stock purchase agreement with Calm, and the 2019 amendments to the Companies' warrants, or would not have done so at the artificially depressed prices agreed to in those transactions.

133.    By virtue of the foregoing, Bernstein, Heyer, Giardina, and Abbe (during his tenure as director) have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its respective sales of its securities.

## XV.    COUNT VIII

### Violation of § 20 of the Exchange Act against Bernstein, Abbe, and Daly

135.    Plaintiffs repeat, restate, and re-allege each and every allegation contained in the foregoing paragraphs with the same force and effect as though set forth more fully herein at length.

136.    Within the meaning of §20(a) of the Exchange Act, as alleged herein Bernstein, Abbe, and Daly acted as controlling persons as to the Company and the other members of the Interested Directors. By virtue of Bernstein's and Abbe's positions as directors (during the period Abbe served as a director) and by virtue of Bernstein's and Daly's control over, and Daly's, Abbe's, and Bernstein's financial interests in, the senior secured Rockmore Note, and their respective stock ownership, their participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Bernstein, Abbe (during his tenure as director), and Daly had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs allege to be false and misleading.

137.    Bernstein and Abbe (during his tenure as a director) were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As of the date Daly purportedly obtained control over the Rockmore Note, he had rights to detailed financial and other reports the Company was obligated to provide pursuant to the terms of that instrument.

138.    In particular, Bernstein, as Chairman of the Board of Directors, had direct and supervisory responsibility for the operations and accounting of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Bernstein also had the power to influence the affairs and conduct of the Company by way of his control over the Rockmore Note. Daly, by way of his substantial financial participation in the Rockmore Note, and, as of April 29, 2019, purportedly control over the Rockmore Note directly or indirectly through B3D, similarly has the power to influence the affairs and conduct of the Company.

139.    As set forth above, one or more of Bernstein, Abbe (during this tenure as director), Perlman, and Giardina violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this First Amended Verified Shareholder Derivative Complaint.

140.    As a direct and proximate result of Bernstein, Abbe, and Daly's wrongful conduct, the Company suffered damages. By virtue of their positions as controlling persons, Bernstein, Abbe, and Daly directed, controlled, or otherwise influenced the acts and/or omission as alleged herein and, therefore, are liable pursuant to § 20(a) of the Exchange Act.

## XVI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, and in favor of the Company as follows:

**(a)**    Awarding to the Company damages in an amount to be determined at trial;

**(b)**    Awarding to the consequential damages;

**(c)**    Awarding to the Company disgorgement;

**(d)**    Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the stock compensations awards described herein;

**(e)**    Equitable subordination of all secured debt currently owned or controlled by Bernstein, Daly, Rockmore, and/or B3D.

**(f)**    Awarding to the Company pre-judgment interest, post-judgment interest, and attorney's fees;

**(g)**    Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiffs' attorneys, experts, and accountants; and

**(h)**    Granting Plaintiffs such other and further relief as this Court deems just and proper.

## XVII.    <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury as to all claims so triable.

Dated: New York, New York
      September 13, 2019

CKR Law LLP

By:

    Rosanne E. Felicello
    Michael James Maloney
1330 Avenue of the Americas
14th Floor
New York, New York 10019
Tel. (212) 259-7300
rfelicello@ckrlaw.com
mmaloney@ckrlaw.com

*Attorneys for Plaintiffs Moreton Binn and Marisol F, LLC*

## <u>VERIFICATION</u>

I, Moreton Binn, being duly sworn, declare as follows:

I am the named plaintiff in this action. I have been the holder of common stock and Series D Preferred Stock of XpresSpa Group, Inc. f/k/a Form Holdings Corp. (the "Company") continuously during the the relevant period defined in the foregoing First Amended Verified Shareholder Derivative Complaint (the "Complaint"). I am ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based on discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: September __, 2019                    _____
                                             Moreton Binn

## <u>VERIFICATION</u>

I, Marisol Binn, being duly sworn, declare as follows:

I am the sole member of the named plaintiff, Marisol F, LLC, in this action. I have authority to make this verification on behalf of Marisol F, LLC. Marisol F, LLC has been the holder of common stock and/or Series D Preferred Stock of XpresSpa Group, Inc. f/k/a Form Holdings Corp. (the "Company") continuously during the relevant period defined in the foregoing First Amended Verified Shareholder Derivative Complaint (the "Complaint"). Marisol F, LLC is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based on discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: September __, 2019                    MARISOL F, LLC

                                                    By: _____
                                                         Marisol Binn